Filed 8/2/12

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S067353 |
| v. | ) | |
| | ) | |
| IVAN JOE GONZALES, | ) | |
| | ) | San Diego County |
| Defendant and Appellant. | ) | Super. Ct. No. SCD114421 |
| _____ | ) | |

Defendant Ivan Joe Gonzales was convicted of murdering Genny Rojas.[1] The jury found as a special circumstance that the murder was intentional and involved the infliction of torture.[2] However, it was unable to reach a penalty verdict. Another jury was impaneled, and the second penalty phase trial resulted in a death verdict.[3]

---

[1] Penal Code, section 187, subdivision (a). Further statutory references are to the Penal Code.

[2] Section 190.2, subdivision (a)(18).

[3] Following defendant's conviction and sentence, his wife Veronica was separately tried for Genny's murder. (*People v. Gonzales* (2011) 51 Cal.4th 894, 910, fn. 8.) We have affirmed her conviction and death sentence. (*Id.* at p. 959.)

## I.  FACTS

### A.  *Guilt Phase*

#### 1.  *Prosecution*

Genny Rojas was four years old when she died in July 1995.  She and her siblings had been removed from their mother's custody in April 1994, because their mother was abusing drugs and neglecting the children.  They were placed with their grandmother, Utilia Ortiz.  While in Ortiz's care, Genny appeared to the social worker to be happy and well cared for.  However, she was a difficult child, fearful and prone to tantrums.  Ortiz soon placed Genny in the care of Ortiz's daughter Anita and her husband Victor Negrette.  After four months, the Negrettes decided that Genny had needs they were unable to meet.  They returned her to Ortiz toward the end of 1994.  In February 1995, Ortiz sent Genny to live with another daughter, Veronica, and her husband Ivan Gonzales, the defendant in this case.  The Gonzaleses had six children of their own and lived in a two-bedroom apartment in Chula Vista.

On the evening of July 21, 1995, two neighbors were standing outside a window of the Gonzales apartment.  They heard a loud bang, or thud, as if something had hit a wall inside the apartment, immediately followed by the sound of a child crying.  Defendant came to the window, looked out, and shut the window forcefully.  He emerged from the apartment, slammed the door, and walked off toward a nearby liquor store.  He appeared to be angry and in a hurry.  Defendant entered the liquor store, where he was a regular customer, at 8:45 p.m.  He asked for and received credit, purchased some grocery items, and left after five or 10 minutes.

Around 9:00 that evening another neighbor, Patty Espinoza, heard Veronica Gonzales screaming for help.  Veronica said her niece had been burned in the bathtub.  Patty came out of her apartment and asked how anyone could be burned

2

in the bathtub. Veronica asked Patty to come with her, and not call the police. In the Gonzales apartment, Patty saw a child lying on the floor. Defendant was nearby. Patty told them she did not know how to perform cardiopulmonary resuscitation (CPR), but that her sister Naomi did. Patty ran to get Naomi, who also lived in the building, and told the Gonzaleses to call 911. Veronica, however, repeatedly said not to call the police.

Naomi Espinoza had heard the commotion, and came out of her apartment upon hearing that a child was not breathing. She saw defendant carrying a little girl. Naomi, a nurse's assistant, had CPR training. She asked defendant what happened, and he replied that the child had burned herself in the bathtub. Questioned further by Naomi, defendant explained that the child did not know how to regulate the water. Naomi told him to take the child into Patty's apartment. Defendant did so, and put her down on the rug.

Naomi testified that she knew the child was dead, "just by looking at her." Nevertheless, she checked for a pulse and attempted CPR. The body was cold, the lips white. Naomi noticed scars on the body and a bald spot on the head. Shortly after the first police officers arrived, Naomi left the apartment.

A 911 call was placed around 9:20 p.m. Sergeant Barry Bennett responded, along with other officers. As he approached the apartment, Veronica met him and directed him inside. Bennett found a little girl lying on the floor. Checking her vital signs, he detected no pulse or breathing. He did not attempt CPR. The body was very cold and felt rigid, indicating to him that the child had been dead for some time. The shirt she was wearing was dry, as were her skin and hair. While he was examining the body, Veronica told Bennett she had put the child in the tub, run the water, and gone to the kitchen to cook dinner. After about 20 minutes, she returned to the bathroom and found the child under the water. Bennett noted that defendant sat nearby, and described his demeanor as "nonchalant."

3

Bennett called in homicide and child abuse investigators. It was obvious to him that the death was not accidental and the child had been abused. The entire lower part of her body appeared to have been burned, and there were numerous other injuries.

Fireman John Miller arrived at the apartment at 9:25 p.m. He too assessed the child, and found her cold and without a pulse. He prepared to perform CPR, but found the jaw clenched and difficult to move. Miller concluded that rigor mortis had set in.

A medical examiner came to the scene around 1:00 a.m. He performed a preliminary external examination of the victim, who was identified as Genevieve Rojas. He noted a second- to third-degree burn from her waist to her feet, and other burns on her face, arms, and torso. Rigor mortis, which begins to develop within an hour or two of death, was present. An autopsy was conducted the next morning. Genny was thin and small, but adequately nourished. Her body was covered with injuries.

A large burned area on top of Genny's head had only partially healed. This injury was infected, and at least a week old. It could have been caused by hot liquid, possibly on more than one occasion. The back of the head was also burned. There was hair loss, both in the burned area and elsewhere. A similar burn appeared on the back of the neck and shoulder. The skin on Genny's ears had been eroded, exposing the cartilage. There were also abrasions at the end of her eyebrows and on the bridge of her nose. These injuries could have been caused by rough fabric tightly bound around her head.

There was bruising around both eyes, probably inflicted within a day or two of death. Pinpoint hemorrhages in the right eye were typical of strangulation. The cheekbone, shoulder, and neck were bruised. There were recent burns on both cheeks, in a grid pattern matching the grill on a hairdryer found in the Gonzales

4

apartment.  Similar burns appeared on the shoulders and left bicep.  Genny's lip was lacerated and torn away from the gum.  Numerous small injuries on her face could have been inflicted with a hairbrush.  She had suffered a subdural hematoma, the result of a blow or shaking within a day of her death, and an older brain hemorrhage that had been caused by a violent blow.

Genny's neck bore a ligature mark, extending upward behind her left ear.  This injury was a week or two old.  A similar scar ran from her jawbone to the underside of her chin.  There were triangular scars on top of her left shoulder.  On her arms were parallel scars typical of the marks left by handcuffs.  Handcuffs matching the marks on Genny's arms were recovered from the Gonzales apartment.  Her arms and wrists also had abrasions, which could have been caused by binding with a cord.  Bruises on the inside of her thighs suggested she had been grabbed from behind with a great deal of force.  Ulcerated areas on both heels in the area of the Achilles tendon were consistent with erosion from binding.

The most significant injury, and the cause of death, was the burn on the lower part of Genny's body.  It appeared to be an immersion burn, with spared areas behind the knees, in the groin area, and on the buttocks indicating that Genny had been held down in a fetal position in the tub, with her arms out of the water.  Death would have occurred within two to three hours.  There was no evidence of drowning.  Genny's thymus gland was atrophied, a sign of prolonged stress.  It was clear to the examiner that she had been chronically and repeatedly abused.

A pediatric burn expert confirmed that the burn was an immersion injury. He estimated the water temperature at 140 degrees or higher.  It would have been seven or eight inches deep, and Genny must have been held down firmly, leaning forward a little.  The burn injury could have been inflicted in 10 seconds or less; it could not have occurred gradually.  With treatment, the chances of survival would

have been around 90 percent. However, within one to four hours of infliction, Genny would have gone into shock. Death could occur quite rapidly thereafter in a child of her age.

The burn on Genny's scalp could have been caused by hot water striking the top of her head and flowing onto her neck and shoulders. The expert did not believe it was accidentally inflicted, or that it could have been caused by Genny tipping over a pot of hot water on the stove.

Officer Bennett went to the Gonzales apartment shortly after he examined Genny's body in Patty Espinoza's apartment. The bathtub in the Gonzales bathroom appeared to be dry, as did the bathroom floor. Human tissue subsequently found in the tub was consistent with Genny's DNA, and not with defendant's or Veronica's. It took 15 minutes to fill the tub with hot water. When full, the water was eight and a half inches deep, and 140 degrees. At that temperature, it would have taken six to eight seconds to cause the burn on Genny's lower body.

In one bedroom, the area behind the door was cordoned with a string fastened to the doorknob at one end, and to the knob of a nightstand placed against the wall at the other. In this triangular area there was an indentation in the wallboard, 36 inches from the floor. There were bloodstains in the indentation, and on the wall around and below it. A blanket behind the door was stained with matter consistent with Genny's DNA.

The closet in this bedroom yielded a considerable amount of bloodstain evidence. The closet doors were off their tracks, and leaned into the closet. A metal hook was fastened to the closet bar mounting bracket. On the floor beneath the hook was a wooden box, measuring about two feet in all three dimensions. A hole in one of the closet doors afforded a view of the hook. On the wall of the closet, below the hook and above the box, were many bloodstains. Some were

6

created by hair wiping against the wall, others were the result of blood being flung against the wall. There was blood on the closet bar, the hook, and the cloth fastening the hook to the bar. There was a bloody footprint on the wall, but no handprint. There was blood on the edge of the box, and both blood and feces in the box. The interior of the closet door was spattered with blood.

The bloodstains were consistent with a scenario in which a bleeding child Genny's size was suspended from the hook in the closet, rubbing some blood on the surfaces around her and casting some off as she swung back and forth, bracing herself with her feet on the box and the wall. Genny's DNA was consistent with blood samples taken from the closet.

Defendant was interviewed by detectives at 9:45 a.m. on the morning after Genny's death. A videotape of the interview was played for the jury. He said Genny had not been toilet trained, and they had problems with her "goin' to the bathroom a lot, in her pants and on the floor." The previous evening, he and Veronica had put Genny in the bath together, and he had "set the water on warm." Only they and their children were in the apartment. After 10 minutes or so Veronica told defendant to check on Genny, but he was distracted by a loud bang and checked on the other children instead. He went to the store and bought milk, bread, and beer, returning in about 10 minutes. Veronica was making dinner. After another 10 minutes or so, she went to check on Genny, and screamed for defendant. He found Veronica taking Genny out of the bathtub. He tried to perform CPR, but it wasn't helping, so Veronica went to get help from Patty next door.

Defendant said Genny had a lot of marks on her body, which he attributed to her habit of peeling and picking at her own skin. The burn on her head had happened when she knocked over a pot of boiling water. They had not gotten a Medi-Cal card for Genny from Veronica's mother, so they tried to care for the

7

burn themselves. Genny would rub her head against the walls. Defendant said the ligature mark on Genny's neck was caused by "neighbor kids" pulling on a candy necklace. He had not noticed the hair dryer burns on Genny's face.

Defendant admitted that he and Veronica made Genny sleep in the closet three or four times. He also said he put her in the box a couple of times, to scare her. Defendant claimed the hook above the box was also meant to scare Genny, but he denied ever tying her to the hook. The hole in the closet door was used to hold a stick on which they would dry clothing, according to defendant. He said they never handcuffed Genny, though Veronica tied her hands with cloth once. He insisted they did not hold Genny down in the hot water.

The jury also watched a videotape of preliminary hearing testimony by defendant's oldest child, Ivan, Jr., who was eight years old when he testified.[4] He said Genny did not sleep with the other children, but in his parents' room or in the bathtub. Her hands and feet were tied when she was in the tub. The children's bedroom had no doorknob, and Ivan, Jr., could look through the hole in the door and see into the bathroom. There was a sliding lock on the outside of the bedroom door.[5] On the night Genny died, Ivan, Jr., and the other children were locked in their room. Ivan saw Genny in the bathtub, through the hole in the door. Then he heard her screaming and crying, but he did not look again. He did not see his

---

[4] In addition to the preliminary hearing videotape, the prosecutor played audio- or videotapes of three prior interviews with Ivan, Jr. These interviews included statements both consistent and inconsistent with Ivan, Jr.'s preliminary hearing testimony. (See *People v. Gonzales*, *supra*, 51 Cal.4th at pp. 908-910.) The preliminary hearing testimony is sufficient for purposes of our factual synopsis here.

[5] The physical evidence, and testimony by investigators, confirmed Ivan, Jr.'s statements about the state of the bedroom door and the view through the hole in the door.

father put water in the tub. After his mother screamed, his father came to the door and told the children to stay in the room. His father seemed to be sad.

When Genny came to live with them, she had all her hair and no marks or bruises on her face. Ivan, Jr., said she lost her hair when his mother burned her, and pulled out her hair. He saw both his parents pulling her hair out, many times. He added that he had watched through the hole in the door on many occasions when his mother and father burned Genny with hot water in the bathtub. "They would put her in the tub and they would start putting hot water, and then a few of her hairs would come off." Genny would lie down in the tub, and his father would hold her head down, with his mother helping. Hot water would come out of the spout, and Genny would scream and cry. Ivan, Jr., never saw her get burned by a pot of hot water on the stove.

Genny would scratch her head on the wall, and when she did his parents would hit her with a belt. Ivan, Jr., said that Genny was potty trained and did not have accidents going to the bathroom. He saw Genny in the closet in his parents' room many times, with her hands tied. He saw her on the floor of the closet, and also in the box. One time he saw Genny hanging in the closet, "in a basket," with her hands tied and her feet off the ground.

The rest of the children ate in the kitchen, but Genny ate in the parents' room. Sometimes Ivan, Jr., would give Genny food, when she was crying for it. If his parents discovered this, they would hit him. Once they made him and his siblings throw balls at Genny. Ivan, Jr., would "throw it crooked" because he did not want to hurt her.

Ivan, Jr., said his mother would usually get what she wanted if his parents disagreed about something. He was afraid of his father, but not of his mother. He thought his mother was afraid of his father, who hit her. However, his mother often told his father what to do, and sometimes he would obey.

9

## 2. *Defense*

Juan Lozano, a nephew of Patty and Naomi Espinoza, testified that when Genny's body was brought into Patty's apartment he tried to perform CPR, before Naomi arrived. He had no difficulty moving Genny's jaw in order to clear an airway. Lozano said Genny was cold, with no pulse or breath. Her hair was damp.

A social worker testified that on July 24, 1995, shortly after Genny's death, Ivan, Jr., told her that he didn't hear Genny cry, but did hear her say "ow," and then his mother had found her in the water. He said he was afraid of his father, but not of his mother. He told the social worker that he did not see anyone hit Genny and did not think his parents would hurt her. On subsequent meetings before the preliminary hearing, he said nothing about Genny being abused. He did say that Genny rarely came out of his parents' bedroom.

The rest of the defense case was primarily aimed at establishing that Veronica was the dominant spouse in defendant's marriage.[6] The owner of a grocery store near the Gonzales apartment testified that she saw defendant in the store on a daily basis, and he was quiet and submissive. Veronica, on the other hand, who came in monthly to cash her check, was assertive and outgoing. When defendant was along he would stay behind Veronica, watching the children, and let her do the talking. Veronica would tell him which brand of cigarettes she would buy for him.

Guadalupe Baltazar, defendant's sister, testified that she had seen Genny at defendant's apartment twice. The first time, about a month after she had come to

---

[6] As noted at the outset, both defendant and Veronica were charged in connection with Genny's death, but they were tried separately.

10

live with them, she was playing with the other children and appeared normal. The second time, shortly after the 4th of July, she had a towel wrapped around her head. Baltazar knew Genny had burned her head, because she was present a couple of weeks earlier when defendant came to their mother's house and asked for money to buy ointment. At the Gonzales apartment, Veronica took the towel off and showed Baltazar the burn, which had formed a scab on Genny's head and shoulder. There were no cuts or scars on her face, arms, or legs.

The Gonzaleses had lived with Baltazar for a while, and she saw them on social occasions. She never saw defendant verbally or physically abuse Veronica, but once, as defendant was working on a car, Veronica angrily slammed the hood on his head. She also pulled some wires out of the car and yelled at defendant, who did not respond other than to tell her to "knock it off." Patricia Andrade, another of defendant's sisters, testified that Veronica was verbally and physically abusive toward him.

Eugene Luna had supervised defendant when he worked as a garbage truck driver. Luna had socialized with the Gonzaleses, and never saw defendant being physically aggressive with his wife. He had seen Veronica on one occasion hit defendant in the mouth with her fist, during an argument. His general impression was that Veronica was in charge of the household and made the decisions. Defendant once told Luna that Ivan, Jr., had seen Luna's son kissing Veronica. He asked Luna to talk to his son about this, but the son denied having an affair with Veronica. Defendant had seemed nervous and embarrassed. Later, Luna's son admitted the affair and said a child had been born as a result. Defendant never mentioned the matter again. About six months later the Gonzaleses moved and Luna had no further contact with them.

Eugene Luna, Jr., testified that he had an affair with Veronica for a few months when he was 16 or 17. On one occasion, defendant had challenged him

11

about the affair, and took a swing at him. Luna, Jr., swung back, knocked defendant down, then helped him up. That was the end of the confrontation. Veronica became pregnant and named Luna, Jr., as the father. Luna, Jr., once saw Veronica become angry with defendant, throw a plate at him, and hit him in the mouth. Another time, after a night of drinking, Veronica had lost her temper when defendant tried to help her roll up a car window. She cursed at defendant and kicked the dashboard of the car. Witnesses called the police, who ended up spraying Luna, Jr., and defendant with mace, and arresting Veronica.

Lorena Peevler knew defendant because her ex-husband was defendant's best friend. Defendant was quiet and shy as a teenager. Lorena became friends with Veronica, and the Gonzaleses lived with the Peevlers for a few months. Veronica picked fights with defendant, yelling at him. She also hit him and scratched him. Defendant tried to protect himself, but did not hit back. After one fight, he ran away and climbed a utility pole. The police came to get him down. Lorena saw Veronica as the boss in the relationship. Frank Peevler testified that he and defendant grew up together. Defendant's parents were not abusive. Defendant was shy and timid around girls. Frank also viewed Veronica as the dominant partner in the Gonzales relationship.

3. *Rebuttal*

On rebuttal, the prosecutor called Martha Halog, a neighbor of the Gonzaleses' in the apartment building where Genny came to live. Halog had overheard an argument in which defendant verbally abused Veronica. Victor Negrette, Veronica's brother-in-law, testified that defendant was a jealous and overprotective husband. He and Veronica argued a lot, and on one occasion she asked Negrette to come get her because defendant had hit her. Negrette heard defendant yell and curse at Veronica many times. He had also seen defendant yanking one of the Gonzales boys by the arm, hitting him with a plastic bat, and

12

kicking another son. Negrette once saw defendant angrily punch out the windows of a car parked near the Gonzales apartment.

B. *Penalty Phase*

The jury that found defendant guilty of murder was unable to reach a penalty verdict, dividing eight to four. The penalty phase was retried before a new jury. The prosecutor relied on evidence of the crime similar to the showing made at the guilt phase. Defendant recapitulated his guilt phase defense, and also provided witnesses testifying to his good behavior in prison, his character when he was growing up, his Catholic upbringing, his children's love for him, and the effect his execution would have on them, his siblings, and his parents.

## II. DISCUSSION

A. *Guilt Phase Issues*

1. *Pretrial Motions*

Defendant challenges the trial court's denial of a series of pretrial motions. These rulings require no extended discussion, because they conform with established California law and defendant develops no arguments persuading us to change our settled views. Thus:

Individual and sequestered voir dire of prospective jurors in capital cases is not required. (*People v. McKinnon* (2011) 52 Cal.4th 610, 632-633; *People v. Gonzales*, *supra*, 51 Cal.4th at p. 956.)

The court properly denied defendant's motion for a jury instruction that a sentence of life without the possibility of parole would mean that he was actually ineligible for parole. (*People v. Salcido* (2008) 44 Cal.4th 93, 164; *People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

The court's denials of defendant's motion to set aside the indictment and motions on related grounds by Veronica, in which defendant joined, were not error on any of the following grounds: inclusion of inapplicable aggravating factors

13

(*People v. Lomax* (2010) 49 Cal.4th 530, 593); failure to designate factors as aggravating or mitigating (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 334); failure to require written findings on aggravating factors (*id*. at p. 333); failure to require proof beyond a reasonable doubt as to aggravating factors, the balance of aggravating and mitigating factors, and the appropriateness of death as the penalty (*ibid*.); lack of intercase proportionality review (*ibid*.); [7] use of the adjectives "extreme" and "substantial" in section 190.3 factors (*Gonzales and Soliz*, at p. 334); asserted vagueness of the section 190.3 factors (*Gonzales and Soliz*, at p. 334); or prosecutorial discretion over whether to seek the death penalty (*People v. Gonzales*, *supra*, 51 Cal.4th at p. 958.)  Defendant makes no attempt to explain how any of these factors may have been a proper ground for setting aside the indictment.  He merely relies on general constitutional arguments that have consistently been rejected by this court.

The trial court properly denied defendant's motion to strike the torture-murder special-circumstance allegation.  Defendant contends the definition of torture murder is unconstitutionally vague and fails to adequately distinguish between death-eligible torture-murderers and other torture-murderers.  We have held otherwise.  (*People v. Chatman* (2006) 38 Cal.4th 344, 394; *People v. Barnett* (1998) 17 Cal.4th 1044, 1161-1163.)  Defendant claims the defects in the special circumstance were particularly problematic under the facts of his case and the instructions given to the jury.  These matters were beyond the scope of his pretrial motion to strike.

---

**7**     Defendant also claims that intracase proportionality review is not available.  However, this court does, when the question is raised, undertake intracase proportionality review to determine whether the penalty is disproportionate to the defendant's personal culpability.  (*People v. Kelly* (2007) 42 Cal.4th 763, 800.)

14

Defendant moved for the jury venire to be drawn from the South Bay Judicial District of San Diego County, where the crime was committed and where he claimed there was a higher percentage of Latino residents. The trial court's denial of this motion was supported by law. (*People v. Coddington* (2000) 23 Cal.4th 529, 573-574; *O'Hare v. Superior Court* (1987) 43 Cal.3d 86, 93-97.) Defendant offers no specific argument other than to claim, without reference to the record, that it was unfair for defendants charged with homicides occurring in the North County Judicial District to have juries drawn from that district, while those charged with homicides in the South Bay Judicial District had juries drawn from the entire county. He did not make this argument below, and it is not properly before us on appeal.

Defendant also challenges the court's denial of Veronica's motion to quash the jury venire, in which he joined. The motion was based on the exclusion of noncitizen residents and felons, grounds that we have rejected. (*People v. Pride* (1992) 3 Cal.4th 195, 227; *People v. Karis* (1988) 46 Cal.3d 612, 631-634.)

Finally, defendant claims the court erred by denying his motion for supplemental discovery of the charging practices of the district attorney, which was aimed at showing racial discrimination in the decision to pursue the death penalty. Defendant concedes that he failed to provide a plausible justification under *People v. McPeters* (1992) 2 Cal.4th 1148, 1171, and *People v. Ashmus* (1991) 54 Cal.3d 932, 980, but asks us to reconsider those precedents. We decline to do so. (See also *In re Seaton* (2004) 34 Cal.4th 193, 202-203.)

2. *Defendant's Waiver of His Right to Be Present*

Defendant contends he did not validly waive his right to be present on four occasions: the initial meetings with prospective jurors before the guilt phase and again before the penalty phase retrial, and two sessions of voir dire exploring prospective jurors' claims of hardship before the guilt phase.

15

Before trial, the court announced that it would use the jurors' lounge to meet with the first group of 300 to 400 prospective jurors. The parties would then return to the courtroom to go through the forms filled out by prospective jurors claiming hardship. The court said that defendant might not want to be present for the initial meeting in the jurors' lounge, and noted that defendants routinely waived the right to be present for such proceedings. The court explained:

"He's got a right to be present. If he wants to be, he will be. Most defendants don't want to do that. He will have to be — he'll be in custody. There will be extra marshals around him. He won't be in as secure a setting so there will be extra security. He'll be in waist chains and handcuffs which can, to some extent, be covered up by clothes. But the overall picture that's presented to the jury isn't going to be quite the same one that we would be able to do here in the courtroom."

Defense counsel said his client would waive the right to be present on that day. The court told defendant what would be happening at the first meeting with the venire. It advised him that he had the right to be present but extra security would be required in the jurors' lounge, meaning that "you'll be in chains." Defendant said he was willing to give up his right to attend the proceedings in the jurors' lounge. On the court day before the first meeting, defense counsel asked the court to be sure the court's records reflected that defendant's presence was not required, "just so that he doesn't end up sitting in a holding tank all day."

At the meeting in the jurors' lounge, the court explained the selection process, the time commitment that was required, and the bases for obtaining a hardship exemption. Those requesting an exemption filled out a form and were told to return in the afternoon. The remaining prospective jurors were introduced to counsel, heard the charges against defendant, received some preliminary

16

instructions, and were given questionnaires to complete. The court told them that defendant "is not present today but will be present at every future hearing."

In the afternoon, prospective jurors claiming hardship came to the courtroom, and the court questioned some of them individually. This process continued the next court day, which the court began by announcing that defendant "is not present, having waived his presence for this initial phase of the jury selection." Ten jurors were not granted hardship exemptions. The court read them the charges and gave them preliminary instructions. The court informed them again that while defendant was not present, he would be at all future hearings.

Before the penalty phase retrial, defense counsel reported that defendant was again willing to waive his right to be present in the jurors' lounge for the "mass group" of prospective jurors, and asked the court to put his waiver on the record. The court again explained, more briefly this time, the nature of the proceedings and asked defendant if he was willing to give up his right to be present. Defendant said yes.

Defendant now claims his waivers were invalid, and notes that he never waived his right to be present in court when the hardship voir dire was conducted before the guilt phase. He argues that the court improperly required him to choose between his right to be present and his right not to be shackled in front of the jury. Defendant contends his constitutional rights to be present under the Sixth and Fourteenth Amendments, and article I, sections 7 and 15 of the California Constitution, were violated, as well as his statutory right to be present under section 977, which could only be waived in writing. (§ 977, subd. (b)(1).)

" 'Under the Sixth Amendment, a defendant has the right to be personally present at any proceeding in which his appearance is necessary to prevent "interference with [his] opportunity for effective cross-examination." '

17

[Citation.]) 'Due process guarantees the right to be present at any "stage that is critical to [the] outcome" and where the defendant's "presence would contribute to the fairness of the procedure." ' [Citation.] ' "The state constitutional right to be present at trial is generally coextensive with the federal due process right. [Citations.]" [Citation.] Neither the state nor the federal Constitution, nor the statutory requirements of sections 977 and 1043, require the defendant's personal appearance at proceedings where his presence bears no reasonable, substantial relation to his opportunity to defend the charges against him. [Citations.]' [Citation.] 'Defendant has the burden of demonstrating that his absence prejudiced his case or denied him a fair trial.' [Citation.]" (*People v. Blacksher* (2011) 52 Cal.4th 769, 799.)

Here, the trial court was too quick to declare that defendant would be subjected to physical restraints if he chose to be present. It did not make the required specific findings of manifest need for restraints. (See *Deck v. Missouri* (2005) 544 U.S. 622, 633; *People v. Duran* (1976) 16 Cal.3d 282, 290-291.) It is reasonable to conclude that defendant's decision to be absent was influenced, in part, by the prospect of being shackled.[8] The court should also have secured a written waiver, as required by statute. (§ 977, subd. (b)(1).) Nevertheless, we have rejected claims of error based on a defendant's absence from jury screening discussions. (E.g., *People v. Rogers* (2006) 39 Cal.4th 826, 855-856; *People v. Ervin* (2000) 22 Cal.4th 48, 72–74; *People v. Hardy* (1992) 2 Cal.4th 86, 178.) In any event, defendant fails to bear his burden of showing prejudice.

---

[8]     We note, however, that defendant did not object when the court mentioned shackling, or propose less rigorous security measures to facilitate his presence at the large meeting of prospective jurors.

18

Defendant does not contend he might have provided assistance to his counsel during these essentially administrative jury selection proceedings. His only claim of prejudice is that the prospective jurors may have gotten the impression that he, charged with a horrible crime, "callously did not bother to show up at his own capital trial." Such a speculative and peripheral consideration is insufficient to establish a reasonable probability (*People v. Watson* (1956) 46 Cal.2d 818, 836) or a reasonable doubt as to the eventuality of a result more favorable to defendant had he been present (*Chapman v. California* (1967) 380 U.S. 18, 87; *Gonzales*, *supra*, 51 Cal.4th at p. 953). Experienced defense counsel saw no need for defendant's presence. The prospective jurors were preoccupied with the mechanics of filling out questionnaires. They were well aware of the large number of venire members, and the sometimes tedious process of jury selection. At the guilt phase, they were told by the court that defendant would be present at all future proceedings, and he was. It is unlikely that the prospective jurors at either phase thought any the less of defendant because he was not personally present at this early stage of the proceedings.

3. *Exclusion of Evidence That Veronica Was Abused as a Child*

Defendant claims the court violated his fundamental right to present a complete defense by refusing to allow him to introduce evidence that his wife Veronica had witnessed and experienced child abuse in her own family, similar to the abuse inflicted on Genny Rojas.[9] Defendant contends this was circumstantial evidence of third party liability, which did not amount to improper propensity or

_____

[9]    Defendant asserts violation of his rights to produce witnesses in his defense under the Sixth Amendment to the federal Constitution and article I, section 15 of the California Constitution, as well as due process violations under the Fourteenth Amendment, and article I, sections 7 and 15 of the state Constitution.

19

profile evidence. He alternatively argues that even if it was proper to bar this evidence on state law grounds, the exclusion violated his federal constitutional rights. Defendant further contends that if his murder conviction is upheld, the torture-murder special circumstance should be vacated because the evidence of Veronica's childhood experiences would have negated the intent-to-kill element.[10]

At trial, defendant made an offer of proof consisting of four documents and an expert witness. He presented a juvenile court petition from August 1980, stating that Veronica's mother, Utilia Ortiz, had brought her 16-year-old daughter Mary (who eventually became Genny's mother) to a sheriff's station and stated she could not control her. Mary had scratches and bruises on her arms, legs, shoulders and back, which she said were the result of her mother's beatings with sticks and boards. Mary said the bruises were minor compared to others her mother had inflicted.

Defendant also offered reports detailing interviews with a cousin, an uncle, and a friend of Veronica's. The cousin recalled that Ortiz drank heavily and was "scary" when drunk, starting fights with her husband. Mary was a stubborn and difficult child, while Veronica and Anita were the favored daughters. The cousin was unable to recall specific incidents, but in August 1980 a social worker had noted the cousin's report that Ortiz had hit Mary with a broomstick and lit a pile of newspapers at her bare feet, causing Mary to run away. The cousin said that once, when drunk, Ortiz had "pulled the girls by their hair and pulled them around the house."

---

**10** Defendant also contends he should have been allowed to present this evidence at the penalty phase, a claim we discuss in part II.B.2., *post*.

20

Veronica's uncle said that Mary had shown him burns Ortiz inflicted on her. Ortiz yelled and cursed at the girls, but Veronica had been spared to some degree because she was the favorite of Ortiz's husband. Ortiz fought with various family members when drunk. Veronica's friend had heard Veronica and Mary describe their abuse in 1986. Mary remembered that Ortiz would "tie them back to back and set their legs on fire." Veronica said she also remembered that. When asked if Ortiz had tortured them, the girls said "yes."[11]

Defendant also proffered the testimony of Dr. Patricia Perez-Arce, a neuropsychologist with expertise in the social development of Latino children. At a hearing held under Evidence Code section 402, Dr. Perez-Arce testified that defendant's family exemplified traditional Mexican-American values. Veronica's family did not share these values, due to her mother's drunkenness and violence. Her mother had provided a model of poor impulse control and violent reaction to stressful or threatening situations. Those experiences would have influenced Veronica in dealing with her own frustrations as a mother.

Perez-Arce conceded that Veronica's biological children were well cared for, but opined that Genny's arrival in the household created stress that caused Veronica to become abusive. Genny may have become the target of that abuse because she had been imposed on Veronica by her mother, because Veronica and Mary had an "adversive" relationship, and because, according to defendant, Veronica suspected him of having had an affair with Mary and perhaps of fathering Genny. On cross-examination, Perez-Arce said she had no data on how

---

[11] Defendant's offer of proof did not specify which, if any, of the witnesses mentioned in the documents would be called to testify. Because we dispose of his arguments on other grounds, we need not consider whether there may have been foundational or hearsay problems with the proposed evidence.

frequently abused children became abusers themselves, but thought it occurred less than half the time. She also acknowledged that Latino men, like men in general, were more likely to physically abuse their children than Latina women.

The trial court, after extended consideration, decided defendant had proffered character evidence that was inadmissible under Evidence Code section 1101. The court further ruled that applying this state rule of evidence did not violate defendant's federal constitutional rights to present a defense, because the evidence of Veronica's childhood abuse, while probative to some degree, was weak and speculative insofar as it reflected on her behavior toward Genny.

We review the court's rulings under Evidence Code section 1101 for abuse of discretion. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1003.) Defendant argues that his proffer did not amount to "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) . . . offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) He notes he did not offer evidence that Veronica had committed prior acts of child abuse. However, the prohibition on character evidence is not so limited. The statute is aimed at evidence of a person's "propensity or disposition to engage in a certain type of conduct," when "offered as a basis for an inference that he behaved in conformity with that character on a particular occasion." (Cal. Law Revision Com. com., 29B pt. 3B West's Ann. Evid. Code (2009 ed.) foll. § 1101, p. 221.) This is precisely what defendant sought to establish by offering evidence of Veronica's childhood experiences. He wanted the jury to infer that she, not he, was responsible for abusing Genny due to a propensity that developed during her youth.

Defendant seeks to distinguish *People v. Walkey* (1986) 177 Cal.App.3d 268, which the trial court found persuasive. There, the prosecution called an

22

expert to testify that Walkey, who had been an abused child himself, fit the profile of a battering parent. The court held that this was impermissible character evidence. (*Id*. at p. 276.) Defendant insists he offered no similar "profile" evidence. However, to the extent he sought to establish that Veronica modeled her conduct on her mother's behavior, he necessarily claimed that Veronica's childhood experiences had resulted in a character trait predisposing her to abuse Genny. The court properly ruled that this evidence was barred by Evidence Code section 1101. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 372-373 [Evid. Code, § 1101 applies to third party culpability evidence]; *People v. Abilez* (2007) 41 Cal.4th 472, 502-503 [same]; *People v. Davis* (1995) 10 Cal.4th 463, 501 [same].)

Defendant contends the evidence showed that Veronica had learned abusive methods of discipline as a child by observing her mother. He compares this case to *People v. Griffin* (2004) 33 Cal.4th 536, 582-583, where the prosecution presented evidence that Griffin had learned slaughtering techniques while working at a meat company, which he then used on the murder victim. However, no specialized techniques were employed in the abuse of Genny Rojas. The more bizarre forms of abuse she suffered (being hung from a hook in a closet and branded with the grill of a hair dryer) required no expertise, nor were they similar to the abuse to which Veronica was allegedly exposed. Likewise, the burns inflicted on Genny with hot water were neither technically arcane nor similar to what Veronica experienced. As for the beating, tying, and handcuffing Genny suffered, the employment of these forms of abuse takes no training. *Griffin* has no application here.

23

Defendant further argues that the proffered evidence was admissible under two of the exceptions recognized in Evidence Code section 1101, subdivision (b).[12] He claims Veronica's childhood experiences were relevant to establish her motive or her identity as Genny's killer. (See *People v. Roldan* (2005) 35 Cal.4th 646, 705-706.) Defense counsel made this argument below, but the trial court was not persuaded. It reasoned that, at bottom, defendant was trying to prove Veronica was likely to have abused Genny because of a character trait that developed from Veronica's earlier experience. The court was correct. A person's own prior misconduct may be admissible to show that the charged offense is so similar as to support an inference that the same person committed both acts, or to show that in light of the prior conduct the person must have harbored a similar intent or motive during the charged offense. (See *Roldan*, *supra*, 35 Cal.4th at p. 706; *People v. Ewoldt* (1994) 7 Cal.4th 380, 402-403.) Here, however, defendant did not offer specific acts of misconduct *by Veronica* as circumstantial evidence of her motive or identity. Rather, he wanted to show that she had *internalized* the abuse she saw and experienced as a child, causing her to become an abusive mother. This is pure character evidence, well beyond the scope of Evidence Code section 1101, subdivision (b).

The trial court also properly rejected defendant's contention that precluding him from introducing Veronica's family history of child abuse would violate his

---

**12**    Evidence Code section 1101, subdivision (b) provides in pertinent part that evidence of a person's past misconduct is admissible "when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act."

federal constitutional rights to present a defense.[13]  As the high court explained in *Holmes v. South Carolina* (2006) 547 U.S. 319 (*Holmes*), a capital case:  " '[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.'  [Citations.]  This latitude, however, has limits.  'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense." '  [Citation.]  This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are ' "arbitrary" or "disproportionate to the purposes they are designed to serve." '  [Citation.]"  (*Holmes*, *supra*, 547 U.S. at pp. 324-325.)

"While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.  [Citations.]  Plainly referring to rules of this type, we have stated that the Constitution permits judges 'to exclude evidence that is "repetitive . . . , only marginally relevant" or poses an undue risk of "harassment, prejudice,  [or] confusion of the issues." '  [Citations.]

"A specific application of this principle is found in rules regulating the admission of evidence proffered by criminal defendants to show that someone else

---

**13**     Defendant relies on the Sixth and Fourteenth Amendments.  He also cites article I, sections 7 and 15 of the California Constitution, but offers no authority supporting a state constitutional claim of error.

committed the crime with which they are charged. See, *e.g.*, 41 C.J.S., Homicide § 216, pp. 56-58 (1991) ('Evidence tending to show the commission by another person of the crime charged may be introduced by accused when it is inconsistent with, and raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence for this purpose are so remote and lack such connection with the crime that they are excluded'); 40A Am.Jur.2d, Homicide § 286, pp. 136-138 (1999) ('[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial' (footnotes omitted)) . . . ." (*Holmes*, *supra*, 547 U.S. at pp. 326-327; see also *People v. Abilez*, *supra*, 41 Cal.4th at p. 503.)

Here, the trial court found that the evidence of Veronica's childhood experiences was weak and speculative, so much so that it would not be admissible against Veronica at her own trial. That finding was amply supported. The incidents of abuse suffered by Veronica and Genny were distinctly dissimilar. Defendant offered to show that Veronica's mother, in drunken rages, beat her teenage daughter Mary, lit newspapers at Mary's feet, pulled her daughters' hair, and tied Veronica and Mary together back to back and "set their legs on fire" in some unspecified manner. There was scant evidence of the extent of the injuries actually inflicted in these incidents, and no indication they were life threatening. The trauma suffered by the four-year-old Genny was of another kind entirely. Genny was not merely beaten, tied up, and burned. She sustained hematomae, severe hair loss, and extensive bruising and scarring including multiple injuries inflicted by restraints. Her fatal scalding was the culmination of a prolonged and persistent course of concerted abuse. While we do not minimize the seriousness of

26

the abuse described in defendant's offer of proof, his attempt to causally link the systematic torture of a small child with stories about intermittent mistreatment of Veronica and her sister when they were teenagers does not withstand scrutiny. The exclusion of this evidence was fully consistent with the principles set out in *Holmes*, *supra*, 547 U.S. 319, and resulted in no error affecting either the murder conviction or the torture-murder special circumstance.

4. *Exclusion of Evidence That Veronica Disliked Genny's Mother*

Defendant sought to introduce two statements Veronica made about Mary Rojas, Genny's mother, when Veronica was interviewed by a detective the morning after Genny's death. Early in the interview, the detective asked where Mary lived. Veronica said Mary was in a rehabilitation facility, and when asked why, replied "Cause she's a little bitch . . . ." Veronica then explained, in a rambling statement, "she just don't care about nothing . . . . She would, she was losing her kids. The kids got taken away you know. Her husband would, they're very bad you know . . . whatever you know doing drugs. . . ." Much later in the interview, the detective pressed Veronica about why she did not know Genny was being scalded in the bath, asking, "can you tell me she never screamed?" Veronica replied, "She does not talk. Her damn mother. I'm not saying . . . I'm saying her damn mother gets her so goddamn freaked out . . . . She can be in there. You can ask the kids. The kids would even go and mess with the water . . . and would she talk? No."

Defendant claimed these statements reflected Veronica's animosity toward Mary, which would in turn support a conclusion that she acted on those feelings of animosity by singling out Genny for abuse. The court excluded the evidence, on the ground that it was too speculative to be relevant. The court noted there was no evidence linking Veronica's antipathy for her sister with her feelings toward

27

Genny. Again, the court indicated it did not believe the evidence would be admissible against Veronica to prove motive at her own trial.

The court's ruling was within the broad scope of its discretion to determine relevance. (See *People v. Cash* (2002) 28 Cal.4th 703, 727.) "Speculative inferences are, of course, irrelevant." (*People v. Stitely* (2005) 35 Cal.4th 514, 549-550; see also, e.g., *People v. Rundle* (2008) 43 Cal.4th 76, 129-130.) Defendant points out that the Gonzales household was already a crowded one when Genny arrived, the couple faced economic challenges, and Genny was a troubled child who was difficult to handle. These facts tend to reflect a disciplinary motive for the abuse suffered by Genny. However, Veronica's statements about Mary included no indication of a desire to harm Genny. When the court made its ruling, no evidence offered by the defense suggested Veronica's feelings about Mary led her to retaliate against Genny. Defendant notes that subsequently, in her proffered testimony on Veronica's family background, Dr. Perez-Arce opined that one factor in Veronica's behavior toward Genny may have been the "adversive relationship" between Mary and Veronica. That opinion, however, appears to be purely speculative. Dr. Perez-Arce had not interviewed Veronica, and offered no factual support for her view.

Defendant argues that the court's exclusion of Veronica's statements violated his federal constitutional rights to present a defense.[14] The argument fails. As discussed above in part II.A.3., *ante*, the exclusion of weak and

---

**14** Defendant relies on the Sixth and Fourteenth Amendments. Again, he refers to the state Constitution but offers no supporting authority. Defendant's claim that the exclusion of this evidence at the penalty phase violated his constitutional rights is discussed *post*, in part II.B.2.

28

speculative evidence of third party culpability does not infringe on a defendant's constitutional rights. (*Holmes*, *supra*, 547 U.S. at pp. 326-327.)

### 5. *Admission of Ivan, Jr.'s Preliminary Hearing Testimony*

Defendant raises a variety of challenges to the admission at trial of Ivan, Jr.'s preliminary hearing testimony. He claims: (1) the testimony was barred by Evidence Code section 1291; (2) the preliminary hearing court should have protected the child by quashing his subpoena; (3) the trial court should have protected the child by excluding the videotape of his preliminary hearing testimony; (4) the trial court should have found the child incompetent to testify at the preliminary hearing; (5) admission of the videotape violated defendant's confrontation clause rights; (6) the preliminary hearing court denied defendant his right to a face-to-face confrontation with Ivan, Jr.; and (7) the preliminary hearing court erroneously sustained an objection when defendant's attorney questioned the child about the consequences of lying. None of these claims has merit.

### a. *Evidence Code section 1291*

Evidence Code section 1291 provides a hearsay exception for former testimony when the witness is unavailable and "[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing." Defendant does not challenge the trial court's ruling that Ivan, Jr., was unavailable because of the trauma that he would suffer if made to testify against his parents at their capital trials. Defendant's contention is that he did not have a meaningful opportunity to cross-examine Ivan, Jr., at the preliminary hearing because the child was placed in foster homes after Genny's death, and defense counsel was unable to interview him or gain information about his mental condition.

29

Defendant refers to various information coming to light after the preliminary hearing to support his argument that there were grounds for challenging Ivan, Jr.'s credibility of which counsel were unaware. However, "Both the United States Supreme Court and this court have concluded that 'when a defendant has had an opportunity to cross-examine a witness at the time of his or her prior testimony, that testimony is deemed sufficiently reliable to satisfy the confrontation requirement [citation], regardless whether subsequent circumstances bring into question the accuracy or the completeness of the earlier testimony. [Citation.]' " (*People v. Wilson* (2005) 36 Cal.4th 309, 343.) Here, the trial court made it clear that any subsequently developed evidence reflecting on Ivan, Jr.'s credibility could be introduced at trial.

Defendant notes that his counsel gained access to Ivan, Jr.'s therapy records only after the preliminary hearing. Those records showed that, before the hearing, the child's therapist had made a note of a report by his foster mother that he and his little brother had been "kicking and hitting each other and also lying." The day before the hearing, he told his therapist that he had had an experience of seeing double, and "I thought it was my soul." Beginning around the time of the hearing, Ivan, Jr.'s social worker saw signs of depression and posttraumatic stress disorder. At an unspecified time, the children's attorney informed the juvenile court that he was concerned about the foster mother violating a court order against asking Ivan, Jr., about the case. The court instructed the social worker to tell the foster mother not to ask such questions. After the preliminary hearing, similar evidence developed: reports by Ivan, Jr., to his therapist of hallucinations, illusions, or lapses in memory; and a diagnosis of posttraumatic stress disorder and depression by a doctor who examined him to determine whether testifying at trial would be harmful.

We are satisfied that defendant's lack of access to this evidence did not deprive him of a meaningful opportunity to cross-examine Ivan, Jr., at the preliminary hearing. Defense counsel thoroughly questioned the child about the differences between his preliminary hearing testimony and the earlier answers he gave to the police and the district attorney when they interviewed him about the events surrounding Genny's death. This questioning by the authorities was far more significant than any questions the foster mother may have asked, and it was recorded. Defendant's claim that he could have undermined Ivan, Jr.'s credibility at the preliminary hearing by cross-examining the child about psychological issues is unpersuasive. An eight-year-old child's grasp of such issues is necessarily limited. Ivan, Jr., had plainly been through a traumatic experience, and counsel was free to explore the effects of that experience on his memory.

b. *Harm to Ivan, Jr.*

Next, defendant claims the court erred by admitting Ivan, Jr.'s videotaped preliminary hearing testimony at trial, despite evidence that this would be damaging to the child. Defendant provides us with no legal authority for this argument, or for his standing to raise it. Neither did he offer any authority on these points in his motion papers below. In any event, there was no error. The trial court addressed defendant's claims, finding that there was some risk of damage to Ivan, Jr., from the use of his testimony, but that the risk was far outweighed by the value of the videotape to the prosecution's case. The court did not abuse its discretion. Ivan, Jr.'s testimony had already been used against his parents at the preliminary hearing. None of the experts to whom defendant now

31

refers stated directly that the mere presentation of a videotape of the testimony at trial would cause undue harm.[15]

c. *Ivan, Jr.'s Competence*

Defendant also claims the trial court erred by finding that Ivan, Jr., had been competent to testify at the time of the preliminary hearing.  Under Evidence Code section 701, subdivision (a), "[a] person is disqualified to be a witness if he or she is:  [¶]  (1) Incapable of expressing himself or herself concerning the matter so as to be understood, either directly or through interpretation by one who can understand him; or  [¶]  (2) Incapable of understanding the duty of a witness to tell the truth."  Defendant relies, as he did below, on additional factors set out in a dependency case, *In re Basilio T.* (1992) 4 Cal.App.4th 155 (*Basilio T.*).  There, the Court of Appeal stated:  "In addition to an awareness of the difference between truth and falsehood, other prerequisites for competency as a child witness are the capacity to observe, sufficient intelligence, adequate memory, the ability to

---

**15**  At a hearing on a motion to quash a subpoena for Ivan, Jr., to appear as a witness at trial, Dr. Charles Marsh, a psychiatrist, testified that showing the videotape at trial would not be a "major trauma."  Ivan, Jr.'s therapist testified that use of the videotape would "probably," or "possibly" have the same effect as live testimony, but then said, "I'm not sure of that."  The therapist's supervisor testified that use of the videotape would be "less traumatic in the short term [than testifying] and could potentially . . . give him some psychological cushion to rationalize how he thinks about his role in all of this down the road."

All this testimony came in response to the prosecutor's questioning, which was aimed at establishing that live testimony would be no more harmful than the videotape.  When these witnesses testified, defense counsel did not attempt to establish that admission of the videotape would be harmful.  Counsel made this argument only after the motion to quash was granted, advancing it in opposition to the prosecutor's motion to admit the videotape.

We note, as well, the absence of any indication in the record that Ivan, Jr., was aware the videotape was presented at trial.

32

communicate, and an appreciation of the obligation to speak the truth." (*Id*. at p. 167, fn. 7.)[16]

At the hearing on the question of Ivan, Jr.'s competence, defendant called Dr. Yanon Volcani, a child psychologist who had reviewed the documentary record and the tapes of Ivan, Jr.'s preliminary hearing testimony and statements to the police. Dr. Volcani had interviewed the child's paternal grandparents, but not the child himself or other caretakers. He testified that Ivan, Jr., had no perceptual difficulties or attention deficit disorder, but that there was a "significant probability" that his memory of the events about which he testified was "not necessarily accurate," due to the chaotic Gonzales household and the boy's stage of development.

On cross-examination, Dr. Volcani affirmed that Ivan, Jr., was not incapable of understanding his duty to tell the truth, or unable to understand questions and express himself in an understandable way. Questioned by the court, the doctor declined to state a definite opinion on whether Ivan, Jr.'s memories were accurate. On redirect examination by defense counsel, Dr. Volcani "free associated" a 68 percent likelihood that Ivan, Jr.'s preliminary hearing testimony was "influenced by other things than the actual events," but said "it doesn't mean they're not accurate."

---

**16** In support of this proposition, the court cited only a treatise. (Meyers, *The Testimonial Competence of Children* (1986-1987) 25 J. Fam.L. 287, 288.) We express no view on whether the additional factors adduced in *Basilio T.*, *supra*, 4 Cal.App.4th 155, are valid. That question has not been briefed, and as discussed above, the trial court's finding that the factors were satisfied was supported by the evidence. We note, however, the general rule that the *credibility* of a witness is an issue for the jury, and not a relevant factor in determining competence to testify. (*People v. Avila* (2006) 38 Cal.4th 491, 589-590.)

33

The trial court ruled that defendant had not carried his burden of proving by a preponderance of the evidence that Ivan, Jr., had been incompetent when he testified at the preliminary hearing. Dr. Volcani clearly stated that the statutory factors governing the competency determination were satisfied, and the court found that opinion amply supported by the videotape of the child's testimony. Regarding the *Basilio T.* factor of whether Ivan, Jr., was able to distinguish truth from falsehood, the court observed that the doctor's testimony was "less than direct." The court concluded that Dr. Volcani's views reflected more on Ivan, Jr.'s credibility than on his "fundamental ability to distinguish truth from fiction." The court added that the videotape, the testimony of other experts on the motion to quash, and the notes of Ivan, Jr.'s therapist confirmed its conclusion. It noted that defendant was free to present evidence challenging Ivan, Jr.'s credibility.

We will uphold a trial court's ruling on the competence of a witness in the absence of a clear abuse of discretion. (*People v. Avila*, *supra*, 38 Cal.4th at p. 589.) No such abuse appears here. Though defendant claims Dr. Volcani's testimony on the impairment of Ivan, Jr.'s memory was uncontradicted, the doctor expressly declined to say the child's memories were inaccurate. The doctor's "free association" of a likelihood of unspecified influences on Ivan, Jr.'s testimony lacked any basis in fact. Defendant's reliance on cases barring the admission of hypnotically aided testimony is misplaced. Nothing suggests that Ivan, Jr.'s testimony was influenced by any such experience.

d. *Confrontation Rights*

Defendant contends the introduction of Ivan, Jr.'s videotaped testimony violated his rights under the confrontation clauses of the federal and state Constitutions in several respects. First, defendant asserts he could not effectively cross-examine Ivan, Jr., at the preliminary hearing. However, "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-

34

examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (*Kentucky v. Stincer* (1987) 482 U.S. 730, 739; see also *People v. Wilson*, *supra*, 36 Cal.4th at p. 343; *People v. Carter* (2005) 36 Cal.4th 1114, 1172-1173.) As discussed above in part II.A.5.a., defendant had such an opportunity. Defendant's constitutional arguments fare no better than his statutory arguments under Evidence Code section 1291.

Next, defendant claims the seating arrangement during the preliminary hearing violated his confrontation rights when the videotape of Ivan, Jr.'s testimony was played at trial. At the outset of the preliminary hearing, the prosecutor asked the court for "protective courtroom seating" for the juvenile witnesses, noting he had filed a written motion that morning and provided copies to defense counsel. In the motion, the prosecutor asserted that both Ivan, Jr., and his brother Michael had expressed great fear of defendant and Veronica in conversations with the police and members of the prosecutor's office. He asked that they be seated facing away from the defendants during the preliminary hearing. The preliminary hearing court granted the motion, ordering that the young witnesses be seated at an angle, not directly facing the defendants. The podium for counsel, however, was placed so that the lawyers had eye contact with the witnesses during questioning, and the witnesses were free to look around the courtroom and make eye contact with defendants, if they desired. The court noted that this arrangement had been discussed in chambers.

Veronica's counsel objected on the ground that the arrangement violated his client's right of confrontation, expressing concern that the children had been coached and that the interests of "a search for the truth" called for the normal seating arrangement. Counsel conceded, however, that if the prosecutor's motion was to be granted, the seating arrangement contemplated by the court was "the least intrusive way of handling it." Defendant's counsel adopted these arguments

35

and recited his reliance on the Sixth and Fourteenth Amendments, as well as the California Constitution. The court noted that both defense counsel were experienced, and expressed confidence in their ability to get at the truth. The court said it was guarding against the intimidation of children "of tender age," and noted that the defendants would be able to see and hear the witnesses, and would be "within eye contact" if the witnesses wished to look at them.

Defendant relies on *Coy v. Iowa* (1988) 487 U.S. 1012, 1016, for the proposition that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact." As the high court noted in *Maryland v. Craig* (1990) 497 U.S. 836 (*Craig*), however, that right has never been held to be absolute, and *Coy* itself reserved the question whether exceptions may exist. (*Craig*, at p. 844.) The *Craig* court recognized an exception in child abuse cases, upholding a statute permitting the child victim to testify via one-way closed circuit television, so long as the court makes a case-specific finding that the child would be traumatized by testifying in the defendant's presence, and the child's testimony is subject to adversarial testing through cross-examination. (*Craig*, at pp. 855-857.)

Defendant argues that *Craig* is no longer viable. He notes its partial reliance on *Ohio v. Roberts* (1980) 448 U.S. 56, and claims that since the *Roberts* hearsay test was overruled in *Crawford v. Washington* (2004) 541 U.S 36, *Craig*'s relaxation of the right to a face-to-face confrontation must also be deemed obsolete. (See *Craig*, *supra*, 497 U.S. at pp. 848-849.) We disagree. *Crawford* and its progeny are limited to "testimonial" *hearsay* statements, and say nothing about whether a witness who testifies *in person* must face the defendant. (*Crawford*, at pp. 61, 68; *Bullcoming v. New Mexico* (2011) __ U.S. __ [131 S.Ct. 2705, 2713-2714]; see also *People v. Seijas* (2005) 36 Cal.4th 291, 303 [*Crawford* did not affect admissibility of prior testimony by unavailable witness].) *Craig*

remains good law. Anticipating that conclusion, defendant claims the preliminary hearing court erred by failing to make a case-specific factual finding of necessity for an alternative arrangement for Ivan, Jr.'s testimony, as required under *Craig*. Defendant observes that the prosecution made no factual showing to support its claim that Ivan, Jr., and his brother feared their parents, and contends the court's concerns on this point were not based on any information specific to this case.

It is important to note that at the preliminary hearing, defendant had no right to confront Ivan, Jr., personally. We have made it clear that the right to confrontation is a trial right that does not apply with full force at a preliminary hearing. (*People v. Miranda* (2000) 23 Cal.4th 340, 349.) Ivan, Jr.'s description of the events on the night of Genny's murder could have been presented through hearsay testimony by police officers, without offending either the state or federal Constitution. (*Miranda*, at pp. 348-349.) Thus, there was no occasion for the preliminary hearing court to make *Craig* findings, and defense counsel did not request them. Defendant, however, claims that when the videotape of the preliminary hearing testimony was introduced at trial, the seating arrangement for Ivan, Jr., violated his trial right to confront the witnesses against him. This is a particularly artificial argument, insisting on *Craig* findings even though no context for such findings ever arose. In any event, the claim fails on its merits.

In *People v. Sharp* (1994) 29 Cal.App.4th 1772, which involved the same seating arrangement at trial as was employed at defendant's preliminary examination, the court noted that the arrangement "resulted in only the most minimal interference with appellant's right to confront his accuser." (*Id*. at p. 1783.) It concluded that this minor interference was justified by the state's interest in protecting the child witness and obtaining accurate testimony. While the trial court had not made the findings required by *Craig*, the *Sharp* court had no difficulty ascertaining from the record that the seating arrangement was fully

37

justified. (*Sharp*, at pp. 1783-1784; see also *Ellis v. United States* (1st Cir. 2002) 313 F.3d 636, 650 ["the less the intrusion on Sixth Amendment rights, the less detail is required in a trial court's findings"].)[17]

Here, while the preliminary hearing court made no factual findings on the need to shield Ivan, Jr., from defendant's gaze, the trial court made extensive findings that the child would be traumatized if he were made to testify at trial. Defendant does not dispute the vulnerability of the young witness, either at the time of the preliminary hearing or the time of trial. Indeed, defendant claims that testifying against his father was so traumatic for Ivan, Jr., that even the videotape should have been excluded from evidence. Here, as in *Sharp*, we conclude that the seating arrangement for the child witness's testimony was fully justified by the record, and defendant's confrontation rights were not violated when the videotape

---

[17] Other state courts have approved the use of similar seating arrangements, without the findings required by *Craig*. (*State v. Miller* (N.D. 2001) 631 N.W.2d 587, 594; *Smith v. State* (Ark. 2000) 8 S.W.3d 534, 537-538; *State v. Brockel* (La.Ct.App. 1999) 733 So.2d 640, 645-646; *Brandon v. State* (Alaska Ct.App. 1992) 839 P.2d 400, 409-410; *State v. Hoyt* (Utah Ct.App. 1991) 806 P.2d 204, 210; *Stanger v. State* (Ind.Ct.App. 1989) 545 N.E.2d 1105, 1112-1113; *Ortiz v. State* (Ga.Ct.App. 1988) 374 S.E.2d 92, 95-96.) The sister-state cases relied on by defendant are distinguishable. (*State v. Lipka* (Vt. 2002) 817 A.2d 27, 32-33 [error in failure to make *Craig* findings conceded]; *Commonwealth v. Johnson* (Mass. 1994) 631 N.E.2d 1002, 1005-1007 [state constitutional provision requiring "face to face" confrontation violated when child sat with back to defendant; door left open for less drastic alternative seating arrangement upon showing of need]; *People v. Tuck* (N.Y. 1989) 551 N.E.2d 578 [pre-*Craig* memorandum opinion; witness unsworn as well as facing away from defendant; error held harmless].) See also *United States v. Kaufman* (10th Cir. 2008) 546 F.3d 1242, 1256-1257 (order that defendants not make eye contact with victim witnesses improper absent *Craig* findings; error held harmless); *Ellis v. United States*, *supra*, 313 F.3d at pages 649-652 (trial held before *Craig*; posttrial *Craig* findings held sufficient).

was introduced at trial. The seating arrangement at the preliminary hearing satisfied the central concerns of the confrontation clause: "physical presence, oath, cross-examination, and observation of demeanor by the trier of fact." (*Craig*, *supra*, 497 U.S. at p. 846.)

Finally, defendant claims he was deprived of his confrontation rights when the preliminary hearing court sustained an objection when defense counsel asked Ivan, Jr., about the consequences of lying. This claim borders on the frivolous. Defense counsel asked Ivan, Jr., a series of questions on this topic. The child answered "yes" when asked if he would get in trouble if he lied in response to one of counsel's questions. The court sustained a prosecutorial objection at this point. It proceeded to advise Ivan, Jr., about the importance of telling the truth, the consequences of lying in court ("you'd get in trouble"), and the unimportance of worrying about anything so long as he told the truth. Ivan, Jr., replied affirmatively when the court asked if he was "comfortable with that," and both the court and defense counsel declared that their concerns were satisfied. No error can be conjured from this scenario. The jury was exposed to a full exploration of Ivan, Jr.'s understanding of the need to be truthful when it watched the videotape.

### 6. *Admission of Defendant's Statements to Police*

Defendant contends he did not validly waive his *Miranda* rights before he spoke with detectives shortly after the murder. (*Miranda v. Arizona* (1966) 384 U.S. 436.) Defendant received a complete advisement of his rights. As defense counsel agreed when the suppression motion was argued, defendant both nodded his head and mouthed the word "yes" when asked if he understood the *Miranda* warnings. However, he gave an unintelligible answer when a detective asked if he wanted to give his "side of the story." The detective told defendant he had already spoken to Veronica, and advised him that her statement would be compared to his in court. The detective asked again if defendant would like to tell him what

39

happened. Defendant said, "Um, well I," and the detective began questioning him. Defendant interrupted to ask for a glass of water, and, while another detective went to get it for him, proceeded to answer the questions posed to him.

Defense counsel argued that the videotape did not establish a clear and unmistakable waiver, and that the mere fact his client had given a statement was insufficient. Counsel conceded that the statement itself was voluntary, telling the court, "We are not arguing that there were improper promises, inducements, or any of the other so-called voluntariness issues."

The court denied the suppression motion. It found that while defendant had clearly indicated he understood his rights, he never expressly agreed to waive them. The detective had interrupted defendant just when he seemed to be responding to the invitation to give his side of the story. Nevertheless, the court concluded, based on several viewings of the videotape, that defendant had voluntarily agreed to give up his *Miranda* rights, as evidenced by his statements freely given with a full understanding of those rights. The court noted that a *Miranda* waiver may be implied from a defendant's behavior, and stated that it interpreted defendant's behavior as amounting to a waiver in this case.

"On review of a trial court's decision on a *Miranda* issue, we accept the trial court's determination of disputed facts if supported by substantial evidence, but we independently decide whether the challenged statements were obtained in violation of *Miranda*." (*People v. Davis* (2009) 46 Cal.4th 539, 586.) Here, the videotape provides substantial evidence supporting the trial court's finding of an implied waiver. The court's ruling was also legally correct.

"No particular manner or form of *Miranda* waiver is required, and a waiver may be implied from a defendant's words and actions. [Citations.] In determining the validity of a *Miranda* waiver, courts look to whether it was free from coercion or deception, and whether it was ' "made with a full awareness of both the nature

40

of the right being abandoned and the consequences of the decision to abandon it." ' [Citation.] Both aspects are tested against the totality of circumstances in each case, keeping in mind the particular background, experience and conduct of the accused. [Citation.]" (*People v. Davis*, *supra*, 46 Cal.4th at pp. 585-586.) This court has long recognized that a defendant's decision to answer questions after indicating that he or she understands the *Miranda* rights may support a finding of implied waiver, under the totality of the circumstances. (*People v. Whitson* (1998) 17 Cal.4th 229, 247-248, citing cases.)

Defendant briefly argues that no implied waiver should be found here, because the detective misled him by saying that Veronica's statement would be used against him in court. Defendant did not make this claim below, and in fact assured the court that no improper inducements had been employed. In any event, we are satisfied that the waiver here was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) Insofar as it was inaccurate for the detective to tell defendant that Veronica's statement would be admissible against him, the practical impact of that statement was neither coercive nor deceptive. It was certainly the case that defendant's and Veronica's statements would be closely compared during the investigation of the crime. The detective's point was that it was in defendant's interest to give his side of the story. Defendant chose to do so, with a full understanding of the nature of his *Miranda* rights and the consequences of abandoning them.

7. *Admission of Veronica's Hearsay Statement*

In response to defendant's showing that Veronica had been an abusive spouse, the prosecutor called Victor Negrette, Veronica's brother-in-law, to testify on rebuttal about an incident in which Veronica told him that defendant had hit her. Defendant objected on hearsay grounds, pointing out that Veronica was not

41

available for cross-examination. The court overruled the objection based on the hearsay exception for spontaneous statements. (Evid. Code, § 1240.)

Defendant contends the admission of this testimony violated his confrontation rights under the Sixth and Fourteenth Amendments, and article 1, section 15 of the California Constitution. However, it is settled that " '[o]nly the admission of *testimonial* hearsay statements violates the confrontation clause . . . .' (*People v. Gutierrez* [(2009)] 45 Cal.4th [789,] 812 . . . ; see also *Michigan v. Bryant* (2011) 562 U.S. ___, ___ [131 S.Ct. 1143, 1153].) . . . 'The court [in *Crawford v. Washington* (2004) 541 U.S. 36] explained that the confrontation clause addressed the specific concern of "[a]n accuser who makes a formal statement to government officers" because that person "bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." [Citation.]' " (*People v. Loy* (2011) 52 Cal.4th 46, 66 (*Loy*), quoting *Gutierrez*, *supra*, 45 Cal.4th at pp. 812-813.)

In *People v. Gutierrez*, we held that a statement made by a three-year-old to his aunt was not testimonial. (*Gutierrez*, *supra*, 45 Cal.4th at p. 813.) In *Loy*, we reached the same conclusion about a statement the victim made to a friend. (*Loy*, *supra*, 52 Cal.4th at pp. 56, 66.) Here, Veronica's statement to her brother-in-law plainly falls in the same category. Its admission did not violate defendant's confrontation rights. (See Cal. Const., art. 1, § 24 [state confrontation right affords no greater rights than federal Constitution].)

Defendant also claims the court abused its discretion under Evidence Code section 1240 because Veronica's statement to Negrette was not "made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240, subd. (b).) Defendant contends there was no evidence showing her statement was made " 'before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still

42

to dominate and the reflective powers to be yet in abeyance.' " (*People v. Thomas* (2011) 51 Cal.4th 449, 495, quoting *People v. Poggi* (1988) 45 Cal.3d 306, 318.) However, Negrette testified that Veronica was crying when she telephoned and asked him to come and get her, crying when he picked her up from defendant's parents' house, and still upset and crying when she described the fight that day during which defendant hit her. We cannot say the court erred in admitting this testimony. " '[T]he discretion of the trial court is at its broadest' when it determines whether an utterance was made while the declarant was still in a state of nervous excitement. (*People v. Poggi*, *supra*, 45 Cal.3d at p. 319.)" (*Thomas*, *supra*, 51 Cal.4th at p. 496.)

### 8. *Admission of Photographs and a Mannequin*

Defendant claims the trial court erred by admitting numerous photographs of Genny, as well as a mannequin used by an expert to demonstrate how her injuries were inflicted. Defendant refers generally to autopsy photographs and crime scene photographs, as well as to a picture of Genny while she was alive. He contends these exhibits were unduly inflammatory and gruesome, and thus should have been excluded under Evidence Code section 352.[18] We have rejected such arguments in the past, and do so again here. The evidence was highly relevant and no more gruesome than the crime.

Defense counsel objected to the admission of the photographic evidence in limine. After a careful review, the court admitted the photographs showing Genny's injuries, commenting that while particularly gruesome, they were

---

[18] Defendant asserts violation of his rights to a fair trial and reliable capital sentencing under the Fifth, Eighth, and Fourteenth Amendments and article 1, sections 7, 15, and 17 of the California Constitution.

43

relevant to show the extent of the injuries and the intent to kill and torture. Defendant claims the photographs were unusually graphic, and cumulative to the expert testimony. However, we have reviewed the exhibits, and conclude the court did not abuse its discretion or violate defendant's constitutional rights.

" 'The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory. [Citations.] The court's exercise of that discretion will not be disturbed on appeal unless the probative value of the photographs clearly is outweighed by their prejudicial effect. [Citations.]' (*People v. Crittenden* [(1994)] 9 Cal.4th 83, 133–134.) '[A] court may admit even "gruesome" photographs if the evidence is highly relevant to the issues raised by the facts, or if the photographs would clarify the testimony of a medical examiner.' (*People v. Coleman* (1988) 46 Cal.3d 749, 776.) 'We have consistently upheld the introduction of autopsy photographs disclosing the manner in which a victim was wounded as relevant not only to the question of deliberation and premeditation but also aggravation of the crime and the appropriate penalty, all of which were at issue here. [Citations.]' (*People v. Cox* (1991) 53 Cal.3d 618, 666.)" (*People v. Ramirez* (2006) 39 Cal.4th 398, 453-454.)

Here, as in *Ramirez*, while "the photographs certainly are gruesome, . . . they were not unduly so. '[V]ictim photographs . . . in murder cases always are disturbing. [Citation.]' [(*People v. Crittenden*, *supra*, 9 Cal.4th at p. 134.)] . . . The photographs at issue here are gruesome because the charged offenses were gruesome, but they did no more than accurately portray the shocking nature of the crimes. The jury can, and must, be shielded from depictions that sensationalize an alleged crime, or are unnecessarily gruesome, but the jury cannot be shielded from an accurate depiction of the charged crimes that does not unnecessarily play upon the emotions of the jurors. The record reflects that the experienced trial judge was

44

well aware of his duty to weigh the prejudicial effect of the photographs against their probable value, and carefully did so. (*People v. Coleman*, *supra*, 46 Cal.3d 749, 776.)" (*People v. Ramirez*, *supra*, 39 Cal.4th at p. 454; see also, e.g., *People v. Heard* (2003) 31 Cal.4th 946, 973-978, discussing cases.)

Defendant complains that one photograph of Genny in a Halloween costume, taken before she came to live with his family, was improper because it tended to arouse the jury's sympathy. However, "the possibility that a photograph will generate sympathy does not compel its exclusion if it is otherwise relevant." (*People v. Harris* (2005) 37 Cal.4th 310, 331.) Here, the photograph was relevant to show by comparison the extent of harm suffered by Genny in defendant's home. (*People v. Cole* (2004) 33 Cal.4th 1158, 1198.)

Defendant also briefly, and without citation of authority, argues that the court improperly allowed the prosecutor to use a mannequin to assist the medical examiner in his testimony about how fingertip bruises had been inflicted on Genny's thighs. The mannequin, described in the record as a "foam doll" about 38 inches tall, was briefly grasped by the examiner during his testimony to show how Genny must have been grabbed from behind. The trial court denied defendant's motion for a mistrial, at which counsel protested that they were surprised by the introduction of the mannequin. The court did not err. Use of such demonstrative aids is routine. (See *People v. Hinton* (2006) 37 Cal.4th 839, 896; *People v. Riel* (2000) 22 Cal.4th 1153, 1195; *People v. Cummings* (1993) 4 Cal.4th 1233, 1291.) Defendant's claim that the deployment of the mannequin here was an improper appeal to the juror's emotions is unfounded.

### 9. *Sufficiency of the Evidence*

Defendant contends the evidence was insufficient to show that he was the perpetrator, that he aided and abetted the murder, or that he intended to torture or kill Genny. We disagree.

45

"In determining evidentiary sufficiency, the court reviews the entire record, in the light most favorable to the judgment, for the presence of substantial evidence. Substantial evidence is evidence sufficiently reasonable, credible, and of such solid value 'that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) The same standard of review applies in considering circumstantial evidence and the support for special circumstance findings. ([*People v.*] *Valdez* [(2004)] 32 Cal.4th [73,] 104–105.)" (*People v. Chatman*, *supra*, 38 Cal.4th 344, 389.)

"Murder by torture requires a killing committed with a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose. It need not be proven that the victim actually suffered pain. However, there must be a causal relationship between the torturous act and death. (*People v. Elliot* (2005) 37 Cal.4th 453, 466–467 . . . .) The jury may infer the intent to inflict extreme pain from the circumstances of the crime, the nature of the killing, and the condition of the body. We have, however, cautioned against giving undue weight to the severity of the wounds. Horrible wounds may be as consistent with a killing in the heat of passion or an explosion of violence, as with the intent to inflict cruel suffering. (*Id*. at p. 467.)" (*People v. Chatman*, *supra*, 38 Cal.4th at pp. 389-390.) " 'To find the torture-murder special circumstance true, the jury had to find that "[t]he murder was intentional and involved the infliction of torture." (§ 190.2, subd. (a)(18).)' (*Elliot*, *supra*, 37 Cal.4th at p. 469.)" (*Chatman*, at p. 391.)

The evidence that Genny was extensively tortured over a period of time was overwhelming in this case. Her injuries were such that an intent to inflict extreme and prolonged pain for a sadistic purpose was obvious. The inference that the torture began as an effort to discipline Genny was reasonable, and defendant admitted that he was the spouse who mainly disciplined the children. He also

46

admitted putting Genny in the box in the closet, and wiring the hook above the box, to "scare her." Defendant further admitted running the bath water for Genny the night she died, and helping Veronica put her in the bath. The evidence showed that it took 15 minutes to fill the bathtub with water hot enough to inflict the burn that caused Genny's death. Defendant could not have been unaware of the temperature, or the effect it would have on the child. After she was forcibly scalded to the point where her skin was sloughing off, defendant did nothing to seek help for her until rigor mortis was setting in. These facts were amply sufficient for the jury to find that defendant intentionally tortured and killed Genny.

10. *The Prosecutor's Closing and Rebuttal Arguments*

Defendant contends the prosecutor committed misconduct twice during closing argument at the guilt phase. In the first instance, the prosecutor said: "You are looking at a murderer of epic proportion. And just because he's five-two doesn't mean a thing. His conduct is so egregious that I have no problem comparing him to a person like Hitler [objection lodged] or the [objection sustained] conduct that was embraced in Bosnia [objection lodged and sustained]." Shortly thereafter, the prosecutor argued, "He's not helpless. He's not crippled. Doesn't matter what his gender is. And he wants to be called a victim. He's Ivan the Terrible. He was the camp commandant [objections lodged and overruled] and this was a campaign of terror."

The other asserted misconduct came during the prosecutor's closing rebuttal. Responding to the defense's claims that Ivan, Jr.'s preliminary hearing testimony had been influenced by others, the prosecutor said, referring to the child advocate who had accompanied Ivan, Jr., "Why not call Bruce Campbell, the man who's at the prelim, the man who is sitting next to Ivan, Jr., when he was testifying? Why not call him? Why doesn't the defense — they put on witnesses.

47

[Objection lodged and overruled.] Why don't they call the process servers? Why don't they call Ivan, Jr.'s psychologist? Why don't they call whatever? Why don't they do something about that? Because they're all going to deny it." At this point, the court sustained an objection and admonished the jury not to consider the prosecutor's speculation about what absent witnesses might have said.

"The standards governing review of misconduct claims are settled. 'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.] Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.] 'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citation.]" (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

Defendant's arguments here are meritless. The court sustained objections to the prosecutor's Hitler and Bosnia references, and counsel's failure to request an admonition forfeited the claim of misconduct. Not to seek an admonition was certainly a reasonable strategic decision, as the rhetorical impact of these references was minimal. While the prosecutor was permitted to call defendant "Ivan the Terrible" and "the camp commandant," these brief epithets were within the permissible range of closing argument. (See *People v. McDermott* (2002) 28 Cal.4th 946, 1002-1003.) As the court explained when asked to preclude a

48

repetition of these comments at the penalty retrial, "where the defense posture is that the defendant is 'Ivan the Meek' and 'Ivan the Submissive,' I have no problem whatsoever with the prosecutor characterizing him as Ivan the Terrible. There is evidence from which the necessary underpinnings could be drawn."

As for the prosecutor's reference to witnesses not called, it is neither unusual nor improper to comment on the failure to call logical witnesses. (*People v. Castaneda* (2011) 51 Cal.4th 1296, 1333; *People v. Cornwell* (2005) 37 Cal.4th 50, 90.) The trial court sustained defendant's objection to the speculative aspect of the prosecutor's argument, and admonished the jury. The admonishment was clear, and fully sufficient to cure any harm. Defendant falls well short of showing the sort of deceptive, reprehensible, and prejudicial argument that would constitute misconduct.

### 11. *Jury Instructions*

Defendant raises a number of claims of guilt phase instructional error.[19] None have merit.

### a. *Denial of Pinpoint Instruction*

Defendant contends the court erroneously denied the following instruction proposed by his counsel:

---

[19] Defendant asserts violation of his rights to due process under the Fourteenth Amendment and article 1, sections 7 and 15 of the California Constitution; to present a defense under the Sixth Amendment and article 1, section 15 of the California Constitution; to trial by jury under the Sixth and Fourteenth Amendments and article 1, section 16 of the California Constitution; and to a reliable penalty determination and to be free from cruel and unusual punishment under the Eighth Amendment and article 1, section 17 of the California Constitution.

49

"In general, a person who fails to help another person by preventing a crime is not guilty of a crime. Likewise, a person is not guilty of murder simply because he or she failed to stop someone else from committing a murder. However, the law provides that a parent or other adult who has custody of a child may be guilty of the crime of neglect under certain circumstances."

The court noted that the subjects of this instruction were covered by the standard aiding and abetting and child endangerment instructions. It reasoned that giving two different instructions on the same topics would risk confusing the jury. The court did not err. An instruction highlighting a defense theory may be rejected if it is duplicative or potentially confusing. (*People v. Moon* (2005) 37 Cal.4th 1, 30.) Here, the jury was instructed that "mere presence at the scene of a crime which does not itself assist the commission of the crime does not amount to aiding and abetting. Mere knowledge that a crime is being committed and a failure to prevent it does not amount to aiding and abetting." (CALJIC No. 3.01.) It was also fully instructed on the elements of and required mental state for the crime of child endangerment. Defendant's proposed instruction was duplicative and would have required the jury to parse different formulations.

In his reply brief, defendant argues that CALJIC No. 3.01 only instructed the jury as to liability for "one possible crime, aiding and abetting," and did not reach defendant's culpability of murder. However, aiding and abetting is not a crime in itself, and was not presented as such by the instructions. It is a theory of liability, and the jury would not have failed to understand its application to the murder charge in this case.

b. *Denial of Instruction on Veronica's Consciousness of Guilt*

Defendant requested an instruction on Veronica's false statements as reflecting her consciousness of guilt. The court denied the instruction, noting that

50

it conflicted with the instruction informing the jury it was not to consider Veronica's prosecution for any purpose. Defendant contends he was entitled to the instruction to support his theory that it was Veronica who harmed Genny. He refers to the evidence that Veronica made false statements about Genny's bath on the night of the murder.

The court was properly concerned with an instruction that would have invited the jury to consider Veronica's guilt "concerning the crime for which she will be tried," as defense counsel framed the instruction. While counsel indicated his openness to "some limiting language," he never proposed terms that would have been specific to defendant's third-party liability theory. The instruction was properly denied.

In any event, "[w]e have noted that similar instructions add little to the standard instruction on reasonable doubt. (*People v. Wright* (1988) 45 Cal.3d 1126, 1134.) We have also held that even if such instructions properly pinpoint the theory of third party liability, their omission is not prejudicial because the reasonable doubt instructions give defendants ample opportunity to impress upon the jury that evidence of another party's liability must be considered in weighing whether the prosecution has met its burden of proof. (*People v. Ledesma* (2006) 39 Cal.4th 641, 720–721; *People v. Earp* (1999) 20 Cal.4th 826, 887.)" (*People v. Hartsch* (2010) 49 Cal.4th 472, 504.)

### c. *CALJIC No. 2.04*

Over defense objection, the court gave the jury the following version of CALJIC No. 2.04: "If you find that a defendant attempted to or did persuade a witness to testify falsely, such conduct may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt and . . . its weight and significance, if any, are matters for your determination." During its discussion of the instructions with

51

counsel, the court agreed with the defense that the evidence supporting this instruction was weak, but decided that given "the constellation of behaviors by the defendant terrorizing these kids from the outset, there is evidence of that, Ivan, Jr., being afraid of him, defendant locking the kids up while this event took place, lying to the kids afterwards as to the conduct, I think the jury could conclude that that was an effort to persuade the kids not to testify."

The evidentiary support for this instruction was indeed thin. Defendant's general behavior toward the children, their fear of him, and the fact that he lied to them about what happened to Genny do not readily suggest the kind of calculated effort to influence testimony that the instruction contemplates. Nevertheless, as in other cases where the propriety of giving CALJIC No. 2.04 has been challenged, "at worst, there was no evidence to support the instruction and . . . it was superfluous. As previously explained, evidence of defendant's guilt was strong. Under the circumstances, reversal on such a minor, tangential point is not warranted." (*People v. Pride*, *supra*, 3 Cal.4th at p. 249; see also *People v. Jackson* (1996) 13 Cal.4th 1164, 1225; *People v. Cole*, *supra*, 33 Cal.4th at p. 1223.)

### d. *CALJIC No. 8.81.18*

Although he did not object at trial, defendant now contends the court erred by giving CALJIC No. 8.81.18 without amending the instruction to require the jury to find a nexus between the torture or intent to torture and the homicide.[20]

---

[20] As given, the instruction required the jury to find the following elements for "the special circumstance, referred to in these instructions as murder involving infliction of torture": "1. The defendant intended to kill, or with intent to kill, aided and abetted in the killing of a human being. 2. The defendant intended to inflict extreme cruel physical pain and suffering upon the living human being for the purpose of revenge, extortion, persuasion or for any sadistic purpose.

*(Footnote continued on next page.)*

52

We consider this claim insofar as defendant's fundamental rights may have been affected. (§ 1259; *People v. Prieto* (2003) 30 Cal.4th 226, 247.) He fails to show any such effect.

Defendant argues that the instruction failed to require the jury to find "some proximity in time or space between the murder and torture," quoting *People v. Barnett*, *supra*, 17 Cal.4th at page 1161, and *People v. Bemore* (2000) 22 Cal.4th 809, 843. However, as in *Barnett* and *Bemore*, such proximity was obvious on the facts of the case. (*Barnett*, at p. 1162; *Bemore*, at pp. 843-844.) Genny suffered a painful death as the result of forcible immersion in a scalding bath. The verdict form reflected the jury's finding that the "murder was intentional and involved the infliction of torture." The jury could not have applied CALJIC No. 8.81.18 so as to make that finding without also finding a temporal and spatial "nexus" between the torture and the murder. (See *Barnett*, at p. 1162.)

e. *CALJIC Nos. 2.02, 2.21.2, 2.22, and 2.51*

Defendant contends that CALJIC Nos. 2.02 (sufficiency of circumstantial evidence), 2.21.2 (witness willfully false), 2.22 (weighing conflicting testimony), and 2.51 (motive) unconstitutionally undermined the requirement of proof beyond a reasonable doubt. We have consistently rejected these arguments. We do so again here, as defendant offers no persuasive reason to change our views. (See, e.g., *People v. Dement* (2011) 51 Cal.4th 1, 53-55, citing cases.)

---

*(Footnote continued from previous page.)*

Awareness of pain by the deceased is not a necessary element of torture in this special circumstance."

12. *Denial of Motion for New Trial*

When it returned the guilt verdict, the jury was polled and each juror individually affirmed the verdict. The jury deadlocked, however, during the penalty phase. The court declared a mistrial on June 5, 1997. It told the jurors they were free to talk to the attorneys or to the court itself, but could also decline to talk about the case. At the next appearance of counsel, the court advised them that four jurors had asked to speak to the court, for a variety of reasons. During two of those conversations, the court asked about "how the jury had analyzed the intent to kill issue."[21] The first juror replied that the jury did not believe defendant intended to kill, but instead thought Genny's death was an unintentional result of his acts. The second juror also said "pretty much the same thing: the jury had not believed there was an intent to kill." The court said it did not inquire further. It identified the jurors as Jurors No. 6 and No. 7.[22]

Defendant moved for a new trial on the torture-murder special circumstance, arguing that the jury's failure to deliberate and reach a conclusion on intent to kill, an essential element of the special circumstance, violated his rights to due process and a fair trial. He attached declarations by Jurors No. 2, No. 4, No. 5, No. 9, and No. 10, stating that the verdict on the special circumstance was based only on the evidence of torture. Jurors No. 4, No. 5, and No. 9 also said the jury "did not separately analyze and find that [defendant] also intended to kill

---

[21]     We do not endorse the court's decision to delve into the particulars of the jury deliberations during informal posttrial conversation.

[22]     Defendant's new trial motion below, and the Attorney General's brief in this court, identify the jurors in question as Jurors No. 6 and No. 12. While there was some confusion at the hearing where the court advised counsel about the conversations, the reporter's transcript reflects the court's affirmative answer to defense counsel's query "did the court mean seven and six?"

the child" and Juror No. 2 said the jury "did not separately find" an intent to kill. Juror No. 10 stated that "the issue of intent to kill was not really discussed or emphasized," and that the special circumstance was not based on "the finding of any intent to kill." Jurors No. 4, No. 5, and No. 10 said they did not personally believe defendant intended to kill Genny; Juror No. 9 personally believed defendant "may not have intended to kill Genny." The statements of personal belief were made in the present tense. The affidavits were dated in July or August of 1997.

Attached to the prosecution's opposition were affidavits by Jurors No. 1, No. 2, No. 3, No. 5, No. 6, No. 7, No. 8, and No. 9, dated later in August 1997. Juror No. 1, the foreperson, said the special circumstance instruction was posted on the wall, with the element of intent to kill underlined. Juror No. 1 said the evidence was discussed in terms of the intent to both torture and kill. Juror No. 1 had responded in the negative when defense counsel had "asked me the narrow question of whether I believed the defendant intended to kill Genny Rojas when he submerged her in the tub on July 21, 1995. . . . However, I was not questioned as to whether I believed the defendant intended to kill Genny Rojas based upon the defendant's omission to act after he had taken her out of the tub, or based upon the defendant's overall conduct toward the victim over the period she lived with the defendant and his wife, which I did consider in deciding whether the defendant intended to kill the victim."

Jurors No. 2 and No. 3 stated, "During deliberation I considered whether the defendant intended to torture and kill Genny Rojas." Juror No. 5 declared that the evidence was discussed "in relationship to the defendant's intent to kill and torture the victim," and that "I believe the legal definition of intent to kill and torture were satisfied." Juror No. 6 "personally considered and believed [defendant] intended to kill Genny Rojas," and said "the instructions were

55

discussed at great length during deliberations." Juror No. 7 said the evidence was considered "in relation to the intent to kill and intent to torture," and stated the belief that defendant "intended to torture and kill Genny Rojas." Juror No. 8 said the issue of intent to kill was "discussed during deliberations." Juror No. 9 said the jury had discussed defendant's failure to act after removing Genny from the bath, and the "continued abuse and torture she had suffered for at least three weeks." Like Juror No. 5, Juror No. 9 believed "the legal definition of intent to kill was proven."

After hearing argument, the court denied the new trial motion. In a written ruling, it reasoned that the affidavits presented by the defense were inadmissible under Evidence Code section 1150 because they reflected "the internal mental processes of the individual jurors or their speculations as to the internal mental processes of other jurors." Regarding defendant's argument that his due process and fair trial rights required the declarations to be accepted despite the statutory bar, the court noted that the policies underlying Evidence Code section 1150 are "weighty and central to the jury system." The court observed that the jury was not required to "separately" analyze or find intent to kill, but simply to make a finding on the special circumstance. The court also noted that the jurors' personal beliefs on the intent to kill question were given more than two months after the verdict was reached, during which time they were exposed to outside influences and subject to "personal second-guessing." None of the jurors said they were unaware of the intent requirement, and two who declared they were personally doubtful about defendant's intent had also signed declarations stating they believed the "legal definition of intent to kill" had been satisfied. Thus, the court concluded that defendant's affidavits were "fraught with substantive weakness and credibility concerns," and could not support a finding that their admission was constitutionally required.

56

The court's ruling was correct. Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible* to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or to dissent from the verdict or *concerning the mental processes by which it was determined*." (Italics added.)

"This statute distinguishes 'between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved . . . .' [Citation.] 'This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.' [Citations.]" (*People v. Steele* (2002) 27 Cal.4th 1230, 1261.)

Defendant contends the jury's failure to deliberate and make a separate finding on the intent element of the special circumstance was an objectively ascertainable overt act. The argument fails. No juror declared there was a failure to deliberate. The jury did make a finding on the issue of intent, returning a written verdict form stating that "the murder was intentional and involved the infliction of torture." The jurors' statements about the mental processes by which that verdict was reached were expressly barred by Evidence Code section 1150. Defendant's claim that excluding these statements would not serve the policies underlying the statute is meritless. Asking jurors to revisit the process by which they reached a verdict plainly opens the door to postverdict jury tampering,

57

harassment of jurors, and instability of verdicts. (See *People v. Steele*, *supra*, 27 Cal.4th at pp. 1261-1262.) We have noted that "[n]ot all thoughts 'by all jurors at all times will be logical, or even rational, or, strictly speaking, correct. But such [thoughts] cannot impeach a unanimous verdict; a jury verdict is not so fragile.' " (*Id*. at p. 1262, quoting *People v. Riel*, *supra*, 22 Cal.4th at p. 1219.)

Defendant argues that applying Evidence Code section 1150 here would deprive him of his rights to due process, a fair trial, and a reliable penalty determination under the Eighth and Fourteenth Amendments, and article 1, sections 7, 15, and 17 of the state Constitution. We have soundly rejected the claim that the federal Constitution guarantees a defendant the right to impeach a verdict with the jurors' internal thought processes. (*People v. Steele*, *supra*, 27 Cal.4th at pp. 1262-1263.) Our reasoning in *Steele* applies equally to defendant's state constitutional claims, which he does not separately analyze. Even assuming there might be circumstances in which constitutional principles would justify an exception to the rule of exclusion set out in Evidence Code section 1150, no such circumstances appear in this case. As the trial court observed, there is no requirement that a jury "separately" analyze any particular element of a special circumstance, and the conflicting affidavits obtained from jurors who had been exposed to outside influences, not to mention a divided penalty deliberation, were hardly reliable indicators of an unconstitutional guilt verdict.

B.  *Penalty Phase Issues*

1.  *Removal of Prospective Juror for Cause*

Defendant claims the court erred by excusing Prospective Juror No. 504 for cause.[23]  This prospective juror disclosed on her questionnaire that she believed an uncle of hers had been unjustly convicted of murder.  In response to a question about her general feelings on the death penalty, she wrote:  "The death penalty should be abolished!  Killing a human being does not serve as a fitting punishment for crimes where the perpetrator needs to reflect on what has been done."  She said life imprisonment without the possibility of parole "gives criminals time to reflect on their crimes," and was a punishment worse than death.  Prospective Juror No. 504 acknowledged that the death penalty "serves as a form of satisfaction for the victim's family," but wrote "none" in answer to a question about which crimes deserved capital punishment.  She said she had favored the death penalty, "until I learned how long it took for actual death to occur."  Nevertheless, Prospective Juror No. 504 said she would not always vote against the death penalty, explaining "sometimes the death penalty is the only appropriate punishment."  Nor would she always vote for the death penalty, because "I consider implementation of the death penalty as a last resort."

On voir dire, the court asked Prospective Juror No. 504 about her uncle's case.  She still felt that he was wrongly convicted.  He was no longer incarcerated and lived in the Virgin Islands.  The court asked if she could fairly sit on a capital jury, given her feelings about her uncle.  Prospective Juror No. 504 replied, "I

---

[23]     He asserts violations of his rights under the Sixth and Fourteenth Amendments, and article 1, sections 7, 15, 16, and 17 of the California Constitution.

don't know." She explained: "It would probably affect me. But I'm going to sort of jump ahead. I have very mixed feelings about the death penalty. Part of me says that if somebody commits a crime that's really horrible, they deserve to die; but a part of me says, is that really just punishment to them? Are they really serving their penalty to society by dying, because they never get to contemplate their crime? I don't think they're really — if they can commit such a crime, I don't think they value their own lives, so would losing it be fit punishment, for them for whatever they committed?"

When the court again mentioned Prospective Juror No. 504's uncle, and her statement of strong opposition to the death penalty, she said, "Just in case somebody ever makes a mistake, you can't bring somebody back, and juries have been known to be wrong." Queried about her view that the death penalty should be abolished, she answered, "Yes. I don't think taking a life for a life is, is fair." Nevertheless, she said, "I think I could be objective." She told the court she would keep an open mind as to the appropriate penalty, and the death penalty "would be a possibility" for her. She also said that because of her views, "it would be very unlikely" for her to vote for the death penalty. The court asked whether her uncle's experience played a part in her concerns. Prospective Juror No. 504 repeated her view that "juries can make mistakes; and if they execute[] the wrong person, you can't bring them back." After looking at a picture of Genny Rojas, Prospective Juror No. 504 told the court she would be able to keep an analytical, open-minded view of the evidence.

Defense counsel questioned Prospective Juror No. 504 about her uncle, establishing that the conviction had occurred in the Virgin Islands when the prospective juror was a child of nine or 10. She had learned about it from her family. She agreed that she was not "adamantly opposed" to the death penalty, and felt it would be appropriate for certain crimes. She did not remember writing

60

on her questionnaire that sometimes it might be the only appropriate penalty. She replied in the affirmative when asked if she could give open and honest consideration to both penalty options in this case.

When the prosecutor asked the prospective juror if there would be capital punishment if she were running the state, she replied, "No. I would subject criminals to medical research. I think that would be a lot better. Make them useful for something." She added that she did not feel capital punishment was proper "at times," because "I don't think . . . they're suffering for whatever crime they committed." The prosecutor inquired about her use of the phrase "at times," and Prospective Juror No. 504 gave Jeffrey Dahmer as an example of "somebody who . . . deserved to die." The prosecutor noted that this was not a case of serial murder, and asked if she could apply capital punishment to torture murder. Prospective Juror No. 504 said she did not know, but when pressed said she could vote for the death penalty in such a case. She could "compartmentalize" her general views on capital punishment. She said her objections were moral, not political, but added, "I'm not going to be protesting in front of the courthouse to abolish capital punishment now."

Asked if she could "override [her] morals and give the people of the state of California a fair trial," Prospective Juror No. 504 said, "I really don't know the answer to that question. I think I would have to hear more to be able to know if I would be able to do that." The prosecutor asked if she minded him asking further questions. She said, "Yes. I mind." The prosecutor said, "You do mind?" She answered, "Yeah. But I — at times, it can sound very conflicting on the left, on one side, and on the right, on the other side. But it depends. Sometimes it depends on the day or it depends on the situation or the case that I hear on the news." In response to a hypothetical question, Prospective Juror No. 504 said she should probably not serve as a juror on a case in which she was morally opposed

to criminalizing the behavior at issue, because "I don't think I would be able to be objective." However, asked if the same considerations applied to her beliefs about capital punishment, she said, "I don't think that you can make that kind of stretch because there are issues that are at hand here. Child abuse. . . . [There] are people concerned about those issues. Issues like that can make me change my moral outlook."

The prosecutor sought to remove Prospective Juror No. 504 for cause. Defense counsel objected, arguing that this prospective juror had consistently said she could set aside her views on capital punishment, and impose the death penalty in an appropriate case, including this case. The prosecutor responded that Prospective Juror No. 504 had become "downright hostile" at times. He questioned whether she had been truthful, noting the inconsistencies in her answers. The court granted the challenge, observing: "She may have been the least satisfying of the jurors that I've seen so far in trying to really get to the bottom of where she is. I was struck by her opposition to capital punishment and then her explanation . . . . I think all sides can be left with some real questions about exactly what her views are. My sense of her, after I was through with her . . . which has not been shaken by both counsel, is that her views substantially impair her ability to perform her duties as a juror. . . . I don't think I've seen anybody like that. I don't remember anyone like that in our examination of jurors in the first case [either]."

The court did not err. "Under the applicable state and federal constitutional provisions, prospective jurors may be excused for cause if their views would prevent or substantially impair the performance of their duties. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424; *People v. Griffin* (2004) 33 Cal.4th 536, 558.)" (*People v. Lancaster* (2007) 41 Cal.4th 50, 78 (*Lancaster*).) Defendant renews in this court his argument that Prospective Juror No. 504 demonstrated her open

mindedness about whether to apply the death penalty in this case. However, on this record we must defer to the trial court's assessment of the prospective juror's suitability.

" 'Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be "unable to faithfully and impartially apply the law in the case." [Citation.] A juror will often give conflicting or confusing answers regarding his or her impartiality or capacity to serve, and the trial court must weigh the juror's responses in deciding whether to remove the juror for cause. The trial court's resolution of these factual matters is binding on the appellate court if supported by substantial evidence. [Citation.]' " (*People v. Boyette* (2002) 29 Cal.4th 381, 416; accord, *Lancaster*, *supra*, 41 Cal.4th at pp. 78-79.) "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown* (2007) 551 U.S. 1, 9; see *People v. Thornton* (2007) 41 Cal.4th 391, 414 (*Thornton*).)

Here, Prospective Juror No. 504 gave conflicting and confusing responses both on her written form and during voir dire. She said that the death penalty should be abolished, that no crimes deserved capital punishment, and that taking a life for a life was not fair. Although she professed that she could be "objective" and consider the death penalty, she also said she would not be able to be objective in a case where she did not believe the defendant's conduct should be a crime. She effectively admitted that her uncle's experience of an unjust murder conviction would affect her penalty deliberation. Thus, as in *Lancaster*, *supra*, 41 Cal.4th at page 80, " '[w]e pay due deference to the trial court, which was in a position to actually observe and listen to the prospective jurors. Voir dire

63

sometimes fails to elicit an unmistakably clear answer from the juror, and there will be times when "the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." ' [Citations.]"  And as in *Thornton*, *supra*, 41 Cal.4th at page 414, the fact that the prospective juror made some statements that might have warranted keeping her as a juror does not change the analysis, in light of other statements supporting the trial court's finding that her views would substantially impair her ability to perform the duties of a juror.

### 2. *Exclusion of Evidence Regarding Veronica's Family*

Before the first penalty phase, defendant sought to introduce the evidence of Veronica's family background that the court had excluded at the guilt phase. (See pt. II.A.3., *ante*.)  Defendant contended this evidence of the abuse to which his wife had been exposed was relevant to establish the mitigating factors set out in section 190.3, factors (g) (whether defendant acted under extreme duress or the substantial domination of another person) and (j) (whether defendant was an accomplice whose participation was relatively minor).  Defendant made the same argument regarding the evidence that Veronica was antipathetic toward her sister Mary, which he claimed gave Veronica a motive to torture and kill Genny.  This evidence, too, had been excluded at the guilt phase.  (See pt. II.A.4., *ante*.)

The court denied the motion to introduce this evidence at the penalty phase. It held that Evidence Code section 1101 barred the evidence of Veronica's childhood experience of abuse, for the same reasons this evidence was inadmissible at the guilt phase.  Similarly, the court adhered to its earlier ruling on the evidence of Veronica's ill will toward Mary, finding it "too great a leap between Veronica's antipathy . . . and her motive to torture and kill Mary's child." These rulings remained in effect at the second penalty phase.

On appeal, defendant claims the exclusion of this evidence at the penalty phase violated his right to present mitigating evidence under *Skipper v. South Carolina* (1986) 476 U.S 1, and deprived him of his constitutional rights under the Eighth and Fourteenth Amendments, and article I, sections 7, 15, and 17 of the California Constitution. We disagree. *Skipper* does not hold that a different analysis governs questions of admissibility at the guilt and penalty phases. We have held that Evidence Code section 1101 applies to third-party culpability evidence at the penalty phase for the same reasons it applies at the guilt phase. (*People v. Farmer* (1989) 47 Cal.3d 888, 921, fn. 5; see *People v. Davis*, *supra*, 10 Cal.4th at p. 501, fn. 1.)

Defendant asserts that a string of United States Supreme Court decisions establishes his right to present relevant mitigating evidence. (*Tennard v. Dretke* (2004) 542 U.S. 274 (*Tennard*); *Eddings v. Oklahoma* (1982) 455 U.S. 104; *Green v. Georgia* (1979) 442 U.S. 95; *Lockett v. Ohio* (1978) 438 U.S. 586.) With that proposition, of course, we have no quarrel. But as we have often explained, the high court has never held that a defendant's right to present mitigating evidence overrides the usual rules of evidence. (E.g., *People v. Phillips* (2000) 22 Cal.4th 226, 238; *People v. Frye* (1998) 18 Cal.4th 894, 1015; *People v. Ramos* (1997) 15 Cal.4th 1133, 1178.) In the words of the *Tennard* court, "the 'meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding' than in any other context . . . . ' "Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." ' " (*Tennard*, *supra*, 542 U.S. at p. 284, quoting *McKoy v. North Carolina* (1990) 494 U.S. 433, 440.)

"[A] State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.' " (*Tennard*,

*supra*, 542 U.S. at p. 285, quoting *McKoy v. North Carolina*, *supra*, 494 U.S. at p. 441.) Here, the evidence defendant sought to introduce at his penalty phase did not relate to his own circumstances or character. (Compare *Tennard*, at p. 285.) He offered the evidence for the same purpose as at the guilt phase, to cast blame on Veronica. Because the evidence did not tend to prove Veronica's guilt, it would not support a finding that a lesser penalty than death was warranted. It bore little relevance to whether defendant acted under duress or substantial domination by Veronica (§ 190.3, factor (g)), or whether his participation was relatively minor (§ 190.3, factor (j)). As we have discussed in connection with defendant's guilt phase arguments, Veronica's childhood experiences were not remotely similar to the abuse inflicted on Genny, and her feelings toward her sister did not establish a motive to torture and kill Genny. Defendant's claims are entirely speculative and establish no deprivation of the right to present relevant mitigating evidence.

### 3. *Exclusion of Veronica's Admissions*

At the outset of the guilt phase, the prosecutor indicated that he intended to introduce statements Veronica made to police officers in the apartment where Genny's body had been brought, and another statement made later at the police station. In the apartment, Veronica had said she put Genny in the bathtub, went to the kitchen to cook dinner, and returned to the bathroom to find Genny submerged in the tub. At the police station, Veronica told an officer that she was in the kitchen cooking when her daughter had drowned. Defense counsel did not object to the statements made at the apartment, but did raise a hearsay objection to the statement at the police station.

The trial court was not persuaded by the prosecutor's arguments that the statement qualified as an excited utterance or a declaration against interest. However, the court overruled the hearsay objection. It reasoned that all the statements were admissible not for their truth, but to show Veronica's

66

consciousness of guilt and defendant's, as well, to the extent their statements were consistent and thus reflected fabrication. Ultimately, the prosecutor elicited only the statements Veronica made at the apartment.

In advance of the penalty retrial, the prosecutor sought to exclude these statements, arguing that they were not relevant as evidence of consciousness of guilt at the penalty phase. Defense counsel's primary argument in opposition was that the statements qualified as excited utterances. The court reminded counsel that its guilt phase ruling had not permitted the statements to be used for their truth, but only as evidence of Veronica's consciousness of guilt. Defense counsel then argued, alternatively, that Veronica's consciousness of guilt was relevant at the penalty phase to show the extent of both parents' participation in the events on the night of the murder. The court questioned whether Veronica's statements showed anything about the degree of defendant's participation.

Counsel responded that Veronica's use of the word "I" rather than "we" when she talked about putting Genny in the bath would allow the jury to draw a conclusion about defendant's role in the incident. Counsel further contended that Veronica's degree of participation was relevant to the jury's consideration of lingering doubt at the penalty phase. The court viewed these arguments as dependent on the truth of Veronica's statements, not their function as evidence of her consciousness of guilt. It rejected the claim that the statements were excited utterances, reasoning that (1) according to Veronica, she had been excited not by the act of putting the child in the bath, but by discovering her floating in the tub later, and (2) her statements were so clearly at odds with the physical evidence and common sense that they were plainly fabricated.

Defense counsel then argued that the rules of evidence should be relaxed to admit the statements, because they were "dramatically important" to the penalty phase defense, and important to the jury's understanding of the circumstances of

67

the crime.  The court disagreed, observing that Veronica's statements were a denial of responsibility and an attempt to portray the events as merely accidental. It concluded that this was not the sort of "dramatic circumstance" that might justify making an exception to the usual rules of evidence.

Defendant claims the court erred.  He argues that Veronica's statements were admissible both as spontaneous statements (Evid. Code, § 1240) and declarations against her penal interest (Evid. Code, § 1230).  We review the court's rulings for abuse of discretion.  (*People v. Ledesma*, *supra*, 39 Cal.4th at p. 708; *People v. Lawley* (2002) 27 Cal.4th 102, 153.)  None appears here.  To qualify as "spontaneous" under Evidence Code section 1240, a statement must have been made " 'before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance.' "  (*People v. Thomas*, *supra*, 51 Cal.4th at p. 495, quoting *People v. Poggi*, *supra*, 45 Cal.3d at p. 318.)  Here, Veronica's statements were not made before she had time to contrive and misrepresent.  A substantial period of time had elapsed between Genny's death and the arrival of the police. Indeed, there was evidence that Veronica sought to prevent the police from being summoned.  There was ample support for trial court's finding that she used the available time to fabricate a story.  The severe scalding on the lower half of Genny's body was utterly inconsistent with the scenario described by Veronica.

In the trial court, defendant did not urge that the statements were admissible as declarations against Veronica's penal interest.  Therefore, this claim of error has been forfeited.  In any event, it is meritless.  " 'With respect to the penal interest exception, the proponent of the evidence "must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." [Citations.]' (*People v. Lawley*[, *supra*,] 27 Cal.4th

68

102, 153.)" (*People v. Elliot* (2005) 37 Cal.4th 453, 483.) Veronica's statements were exculpatory rather than inculpatory, and therefore were not against her penal interest. (*Id*. at pp. 483-484.)

Defendant asserts, in passing, that the statements were admissible under the "nonstatutory catch-all exception to the hearsay rule," and for the nonhearsay purpose of demonstrating Veronica's consciousness of guilt. He offers no argument or authority to support a nonstatutory hearsay exception, and we reject this claim.[24] As to Veronica's consciousness of guilt, defense counsel failed to make a clear showing of the relevance of this factor in the penalty phase, and appeared to have abandoned it as a ground for admission by the time the argument below concluded. We do not fault the trial court for reasoning that defendant's arguments for admissibility depended on the truth of Veronica's statements. Nevertheless, Veronica's consciousness of guilt had some relevance to establish her participation in the crime, and to lend some support to defendant's claim that *his* participation was "relatively minor." (§ 190.3, factor (j).)

Any error was clearly harmless, however. Veronica's guilt, like defendant's, was strongly suggested by the physical evidence. Defendant himself told the police that he and Veronica both put Genny in the bath. Veronica's statements were consistent with defendant's; her use of the pronoun "I" did not exclude him as a participant. Defendant speculates the jury might have concluded that Genny was placed in the bathtub twice, once by both parents and then again

---

**24**    Unlike the federal rules of evidence, our Evidence Code does not include a "catchall" hearsay exception. (See Fed. Rules Evid., rule 807, 28 U.S.C.) We have recognized that decisional law may provide authority for an exception. (*People v. Ayala* (2000) 23 Cal.4th 225, 268.) Defendant, however, refers us to no such authority.

by Veronica alone, after defendant left the apartment. Defense counsel below offered no such theory, and nothing in Veronica's statements supports it. Her statements did not change the story defendant told: they put Genny in the bath; defendant left for about 10 minutes to buy groceries while Veronica was making dinner; and after he returned Veronica found Genny in the bath and called him for help. Because her statements did not significantly alter the scenario before the jury, we conclude there is no reasonable possibility that the jury would have returned a different penalty verdict had they been admitted into evidence. (*People v. Robinson* (2005) 37 Cal.4th 592, 641-642.)

Defendant further contends the exclusion of Veronica's statements infringed his rights to present a penalty defense and to a fair trial and a reliable penalty determination, under the Sixth, Eighth, and Fourteenth Amendments, as well as article I, sections 7, 15, and 17 of the California Constitution. The United States Supreme Court has recognized a narrow exception to the general rule that hearsay evidence is inadmissible, which is limited to particularly critical and reliable mitigating evidence. (*Green v. Georgia*, *supra*, 442 U.S 95, 97; see *People v. Eubanks* (2011) 53 Cal.4th 110, 150.) "Exclusion of hearsay testimony at a penalty phase may violate a defendant's due process rights if the excluded testimony is highly relevant to an issue critical to punishment *and* substantial reasons exist to assume the evidence is reliable." (*People v. Phillips*, *supra*, 22 Cal.4th at p. 238.) Veronica's statements do not meet this high standard. The trial court deemed them fabrications, they were entirely consistent with defendant's own exculpatory statements, and their evidentiary value was limited to reflecting Veronica's consciousness of guilt. Thus, they were neither particularly reliable nor highly relevant. Tellingly, defendant places far more weight in his briefs on the value of the statements as admissions than on their tendency to establish a consciousness of guilt. As admissions, the statements were entirely unreliable.

70

Defendant claims it was fundamentally unfair to allow Veronica's statements to come in at the guilt phase, yet exclude them at the penalty retrial. He accuses the prosecutor of taking inconsistent positions. There is no merit in these claims. At the penalty phase the trial court gave defense counsel a fair chance to establish the relevance of the evidence for the same purpose it served at the guilt phase. Counsel failed to make a persuasive showing. Nor did the prosecutor take an inconsistent position on any factual theory. Strategic choices about what evidence to present are a routine feature of criminal trials.

### 4. *Denial of Request to Exhibit Defendant's Children*

During the first penalty phase, defense counsel informed the court that they intended to bring defendant's children to the courtroom for the jury to see them. Counsel proposed doing this during the testimony of the grandparents, or of the children's lawyer, who would be testifying about the effect on the children if their father were executed. In this way, they could avoid hearing "unpleasant parts" of the testimony. The court refused to permit the children to be brought in. It noted that it had "taken substantial measures to keep the kids away from this case." It found that the children's physical appearance was irrelevant to the question of whether they loved their father and would be hurt by losing him to an execution. Only if they testified would their presence materially add to the jury's deliberations, and the court would not allow that to happen.[25]

The court was not persuaded by counsel's arguments that the children's appearance would be powerful evidence in mitigation, and that there was no

---

[25] At the guilt phase, the court had refused to allow the prosecutor to subpoena the older children, Ivan, Jr., and Michael, based on the psychological harm that might result if they testified. Defendant did not seek to call his children as witnesses.

71

evidence the four younger children would be harmed if they were exposed to the proceedings. It ordered that the children were not to be brought to court, based on the irrelevance of their presence to the penalty deliberations. The court agreed to give the jury an instruction informing it that the children's absence was due to the court's ruling.

The matter came up again at the penalty phase retrial, when the prosecutor asked the court to make sure the children would not be present. He noted that they had been in the courthouse during the last penalty phase. A juror had told the prosecutor that in an elevator one day, one of the children had asked defendant's father, "Are these the people that are going to kill daddy?" The court responded firmly, advising defense counsel and defendant's family members that the children were not to be brought to the courthouse while the trial was in progress.

Defendant contends that the exclusion of his children violated his right to present relevant mitigating evidence, depriving him of his constitutional rights under the Sixth, Eighth, and Fourteenth Amendments, including his right to a public trial. We disagree. Parading defendant's children before the jurors would have provided no relevant evidence in the penalty phase proceedings. Defendant erroneously asserts that the impact his execution would have on the children was a proper consideration.

"The impact of a defendant's execution on his or her family may not be considered by the jury in mitigation. (*People v. Smith* (2005) 35 Cal.4th 334, 366– 367; *People v. Smithey* (1999) 20 Cal.4th 936, 1000; *People v. Ochoa* (1998) 19 Cal.4th 353, 454–456 . . . .) In *Ochoa*, we explained it is a defendant's background and character, and 'not the distress of his or her family,' that is relevant under section 190.3. (19 Cal.4th at p. 456.) We distinguished between 'evidence that [a defendant] is loved by family members or others, and that these individuals want him or her to live . . . . [and evidence about] whether the

72

defendant's family deserves to suffer the pain of having a family member executed.' (*Ibid.*) The former constitutes permissible indirect evidence of a defendant's character while the latter improperly asks the jury to spare the defendant's life because it 'believes that the impact of the execution would be devastating to other members of the defendant's family.' (*Ibid.*)" (*People v. Bennett* (2009) 45 Cal.4th 577, 601 (*Bennett*).)[26]

Simply seeing defendant's small children in the courtroom would not have provided the jury with insight into whether they loved him and wanted him to live. Their mere physical appearance would not have spoken, even indirectly, to his background and character. There was a great deal of witness testimony about the children and their love for defendant. The court properly excluded the children themselves from the trial on relevance grounds, and doing so did not violate defendant's constitutional rights.[27] (See *Bennett*, *supra*, 45 Cal.4th at p. 602.)

> 5. *Exclusion of Execution Impact and Family Background Evidence*

Defendant claims the court erred by excluding items of mitigating evidence relating to the impact of his execution on Ivan, Jr., and to defendant's family background. We reject these claims.

---

[26] We note that our decisions clarifying the distinction between "execution impact evidence" and the feelings of a defendant's family as indirect character evidence were issued after this case was tried.

[27] Defendant did not assert his right to a public trial below, so the trial court had no occasion to consider it. That claim of error was forfeited. In any event, it has no merit. The right to a public trial is not absolute (*Waller v. Georgia* (1984) 467 U.S. 39, 45), and does not extend to a defendant's young children. Trial courts have broad power to control their courtrooms, and may exclude " 'youth of tender years.' " (*People v. Woodward* (1992) 4 Cal.4th 376, 385, quoting *People v. Hartman* (1894) 103 Cal. 242, 245; see also, e.g., *McConnaughey v. United States* (D.C. 2002) 804 A.2d 334, 341; *Reed v. United States* (8th Cir. 1972) 461 F.2d 1106.)

At the first penalty phase, during in limine discussions about the scope of testimony, the court ruled that the prosecutor would be allowed to cross-examine the children's attorney about whether they had been hurt by Genny's death and the events that led up to it, as a way of responding to defendant's claim that they would be harmed by his execution. Defense counsel proposed asking on redirect whether Ivan, Jr., was harmed by having his preliminary hearing testimony presented at trial. The court summarily denied this request. During the direct examination of the children's attorney, defense counsel elicited the view that they would be devastated by the execution of their father. He then began to ask: "Is the fact that Ivan, Jr., was a witness through his videotape and videotaped statements —." An objection was sustained at this point.

In advance of the penalty phase retrial, defense counsel asked the court to take judicial notice of the fact that Ivan, Jr., had testified against his father. Counsel wanted to argue that because the child testified at the preliminary hearing, his father's execution would be particularly harmful to him. After hearing argument, the court concluded it would be misleading to provide the jury with the fact but not the substance of Ivan, Jr.'s testimony. The court made it clear that either side could introduce the child's statements, but declined to take notice of them.

Defendant claims the court erred. However, as discussed above, the impact of defendant's execution on his children was not a relevant consideration. Accordingly, whatever influence Ivan, Jr.'s testimony may have had on that impact was also irrelevant. Defendant did not seek to use Ivan, Jr.'s testimony at the guilt phase for a relevant purpose, i.e., to show his love for his father and desire for him to live. (See *Bennett*, *supra*, 45 Cal.4th at p. 601.) Defendant fails to establish any error on this point.

74

Defendant also argues, briefly, that the court erroneously sustained objections to questions exploring his father's and uncle's family background, and his mother's disapproval of his relationship with Veronica. The court did not abuse its discretion by excluding such "marginally relevant testimony," which would have diverted the jury's attention away from defendant's character and experience and toward the experiences and views of his parents and uncle. (*People v. Holloway* (2004) 33 Cal.4th 96, 148-149.)

Finally, defendant complains that the trial court discouraged him at the penalty phase retrial from presenting testimony that he treated his son Anthony evenhandedly, even though he believed Anthony was not his biological child. Defendant claims the court permitted the prosecutor to rebut such a showing with evidence that the Gonzales apartment was filthy. However, the court allowed defendant to present testimony from his sisters that he treated Anthony the same as the other children and did not abuse him, despite believing that he was the product of Veronica's affair with Eugene Luna. The court's in limine ruling allowing evidence of the condition of the apartment was limited to rebuttal of any showing by defendant that went beyond evenhanded treatment and tried to paint a "warm and fuzzy" positive picture of defendant's relationship with Anthony. Defendant did not attempt to make that further showing. "The scope of rebuttal evidence is within the trial court's discretion, and on appeal its ruling will not be disturbed absent ' "palpable abuse." ' [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1088.) No such abuse appears here.

### 6. *Alleged Prosecutorial Misconduct*

Defendant claims the prosecutor committed misconduct on various occasions during his opening statement and closing arguments at the penalty phase retrial.[28]  We conclude there was no misconduct.

As noted in part II.A.10., *ante*, "[t]he standards governing review of misconduct claims are settled.  'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.' [Citation.]  'In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.'  [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." '  [Citation.]" (*People v. Friend*, *supra*, 47 Cal.4th 1, 29.)

Defendant complains that the prosecutor referred to him as "the camp commandant" in the opening statement, and "Ivan the Terrible" in closing argument.  Defendant did not object to the "Ivan the Terrible" epithet, however,

---

[28]    He asserts violations of his rights to a fair trial and due process under the Fourteenth Amendment and article I, sections 7 and 15 of the California Constitution; to a fair and reliable penalty determination under the Eighth Amendment and article I, section 17 of the of the California Constitution; and to representation by counsel and confrontation of witnesses under the Sixth Amendment and article I, section 15 of the of the California Constitution.

and as we have held with respect to the guilt phase arguments, the prosecutor's characterizations were within the realm of permissible argument. (Pt. II.A.10., *ante*.) Nor was the "camp commandant" remark improper in the opening statement. (See *People v. Dennis* (1998) 17 Cal.4th 468, 518.) Defendant complains that the prosecutor had told the court and opposing counsel he would not use that epithet. However, as the remark was not improper, defendant was not prejudiced.

Next, defendant claims it was misconduct for the prosecutor to refer in closing argument to an empty chair on which he had placed a "reserved" sign. The reference was as follows: "You know, folks, I reserved this seat right here; that is me. And I put a 'reserved' sign on it. Nobody's ever sat in this seat during this trial. And there's a reason for it: it serves as an illustration that somebody cares about Genny and that Genny does exist in all of our hearts and that a murder victim shall exist, until the trial is over, at least." In advance of the argument, the court had overruled defendant's objection to such comments, although the anticipated focus had been that the prosecutor would argue that Genny's parents did not care for her. Defendant claims the argument was an improper appeal to the jurors' emotions. We disagree; at a penalty phase, an appeal for sympathy with the victim is not out of place. (*People v. Jackson* (2009) 45 Cal.4th 662, 691.) The prosecutor's argument here was not inflammatory.

Defendant also takes exception to references by the prosecutor to his appearance: "Putting him in a purple cardigan, or whatever you call that, that doesn't make him more of a human. That's not what he wore around the Gonzales household. That's not even the way he looked, from what we can tell. . . . He used to have facial hair. He doesn't have that anymore. Why?" Defendant did not object at trial, and therefore this claim of misconduct has not been preserved. It is also meritless. (*People v. Schmeck* (2005) 37 Cal.4th 240, 298-299.)

77

Defendant contends the prosecutor argued facts not in evidence when he asked the jurors to imagine going into the bedroom in the Gonzales apartment where Genny was kept, saying, "and it smells, smells of feces and urine." Again, defendant failed to object. In any event, the jury at the penalty phase retrial heard evidence that the box in the closet in this bedroom contained fecal matter, and the blanket found on the floor behind the door along with wadded toilet paper was very moist.

Defendant claims the prosecutor engaged in inflammatory argument when he said: "Where else, where else in our history — think through history — where else was it condoned that you could burn a child, that you could hang a child, that you could stuff a child in a box? Where else have we had that type of conduct? In concentration camps? [Objection overruled.] We've had concentration camps throughout history, whether it's in Eastern Europe, Rwanda, Bosnia, wherever it is, that when you saw this type of conduct. And the defendant embraced it. He sought it out with zeal and passion. Yet, once again, we hear the same type of defense: 'I was just following orders. I'm a victim. I had to. I'm a victim. I was just following orders.' Not here, folks, not this case, not Genny's case, huh-uh."

While the prosecutor trod close to the line with this argument, we conclude it was not misconduct. " ' "In general, prosecutors should refrain from comparing defendants to historic or fictional villains, especially where the comparisons are wholly inappropriate or unlinked to the evidence." ' [Citation.]" (*People v. Jablonski* (2006) 37 Cal.4th 774, 836-837.) Here, the prosecutor limited his analogy to conduct, not individuals, and the comparison was not inappropriate given the extreme forms of torture inflicted on Genny. Furthermore, the prosecutor made a larger point about defendant's attempt to avoid responsibility by claiming he was dominated by Veronica. (Cf. *Jablonski*, at p. 837.)

Defendant next claims the prosecutor committed misconduct when he asked the jurors to picture themselves with a gun in the Gonzales apartment on the night Genny died, and asked them at what point they would intervene. The court overruled defense counsel's objection. Defendant compares the prosecutor's tactic to the argument this court disapproved in *People v. Jackson* (1963) 59 Cal.2d 375, 381. However, in *Jackson* the prosecutor told the jurors they would have killed the defendant to protect the victim, and thus should not be "squeamish about doing it legally." (*Ibid.*) Here, the prosecutor was illustrating that Genny's death was the result of a continuing course of conduct that inevitably resulted in her death. Defendant had clearly been aware of the extensive abuse Genny suffered. Yet he failed to intervene, even under his theory of the events. While the prosecutor's argument was melodramatic, we cannot say it was a deceptive or reprehensible method of persuasion, nor was it likely to lead the jury to abandon its appropriate function at the penalty phase. (*People v. Friend*, *supra*, 47 Cal.4th 1, 29.)

Defendant claims the prosecutor misstated defense arguments and disparaged defense counsel by (1) suggesting that the number of defenses raised reflected on their veracity; (2) claiming that "any efforts by his attorneys to humanize him is ridiculous"; and (3) asserting that any argument by the defense that the death was the accidental result of "discipline out of control" amounted to a claim that Genny somehow contributed to the homicidal acts. These arguments were within the prosecutor's "wide latitude in describing the deficiencies in opposing counsel's tactics and factual account," which includes "anticipat[ing] the flaws likely to appear in counsel's closing argument based on evidence that was introduced." (*People v. Bemore*, *supra*, 22 Cal.4th at p. 846; see also, e.g., *People v. Redd* (2010) 48 Cal.4th 691, 735-736.)

Finally, defendant argues that it was improper for the prosecutor to ask, "If he was such a great father, why did he let his children see this?" The court

overruled defense counsel's objection to this remark, and properly so. Defendant contends the defense did not make the claim that he was a good father, and there was no evidence that the children saw what had happened. However, defendant put on evidence that his children loved him, and that he treated Anthony in an evenhanded way though this child was not his biological son. The injuries sustained by Genny, some of which were weeks old, would have been obvious to anyone living in the Gonzales apartment. The prosecutor's rhetorical question was within the range of permissible argument.

### 7. *Jury Instructions*

Defendant raises a number of claims of instructional error, all of which are foreclosed under previous decisions of this court. He fails to offer persuasive reasons to change our views. Thus:

The court did not abuse its discretion by declining to give two instructions proposed by defense to replace or supplement CALJIC No. 8.85. These instructions would have told the jury that factor (a) of section 190.3 (the circumstances of the offense) could be either aggravating or mitigating, and the rest of the statutory factors could only be considered mitigating factors. Nor did the court err in refusing instructions elaborating on factor (k) (any other extenuating circumstances) and delineating nonstatutory mitigating factors.[29] It is settled that CALJIC No. 8.85 properly instructs the jury on aggravating and mitigating factors, and the court need not give pinpoint instructions on mitigation. (*People v. Howard* (2010) 51 Cal.4th 15, 38-39; *People v. Lomax*, *supra*, 49 Cal.4th at p. 593; *People v. Butler* (2009) 46 Cal.4th 847, 875.)

---

[29] Defendant does not set out the terms of these instructions in his briefs, and confines his argument to general considerations.

Defendant claims the court erroneously failed to give an instruction stating: "The mitigating circumstances that I have read for your consideration are given to you merely as examples of some of the facts that you may take into account as reasons for deciding not to impose a death sentence in this case. [¶] But you should not limit your consideration of mitigating circumstances to these specific factors. You may also consider any other circumstance relating to the case or to the defendant as shown by the evidence as reasons for not imposing the death penalty. [¶] Any one of the mitigating factors, standing alone, may support a decision that death is not the appropriate punishment in this case." We have held that such instructions need not be given because they duplicate CALJIC No. 8.85's explication of section 190.3, factor (k). (*People v. Tafoya* (2007) 42 Cal.4th 147, 187-188; see also *People v. Lucero* (2000) 23 Cal.4th 692, 729; *People v. Noguera* (1992) 4 Cal.4th 599, 647-648.)

Defendant challenges the court's refusal to instruct the jury, "You may spare the defendant's life for any reason you deem appropriate and satisfactory, or for no reason at all. If something arouses mercy, sympathy, empathy or compassion such as to persuade you that death is not the appropriate penalty, you may act in response thereto." Again, we have held such instructions are properly denied. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1420; *People v. Ledesma*, *supra*, 39 Cal.4th at p. 739; *People v. Lenart* (2004) 32 Cal.4th 1107, 1135.)

The court did not err by instructing the jury that it need not be unanimous in finding aggravating circumstances. (*People v. Lomax*, *supra*, 49 Cal.4th at p. 594; *People v. Butler*, *supra*, 46 Cal.4th at p. 875.)

The court was not required to instruct on lingering doubt. (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at pp. 325-326; *People v. Howard*, *supra*, 51 Cal.4th at p. 38.)

The court was properly guided by our decision in *People v. Noguera*, *supra*, 4 Cal.4th at pages 639-641, when it instructed the jury that "[i]f you conclude that the aggravating circumstances are so substantial in comparison to the mitigating circumstances that they warrant death instead of life without parole, you shall return a judgment of death."

The CALJIC instructions allowing the jury to consider the circumstances of the crime in aggravation do not result in arbitrary and capricious application of the death penalty. (*People v. Lomax*, *supra*, 49 Cal.4th at p. 593; *People v. Leonard*, *supra*, 40 Cal.4th at p. 1429.)

The instructions were not defective for failing to impose a burden of proof on the prosecution, or for failing to inform the jury that there was no burden of proof. (*People v. Howard*, *supra*, 51 Cal.4th at p. 39; *People v. Elliot*, *supra*, 37 Cal.4th at p. 488.)

The court was not required to instruct on a "presumption of life." (*People v. Howard*, *supra*, 51 Cal.4th at p. 39; *People v. Lomax*, *supra*, 49 Cal.4th at pp. 594-595.)

The phrase "so substantial" in CALJIC No. 8.88 is not impermissibly broad. (*People v. Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 334; *People v. Lomax*, *supra*, 49 Cal.4th at p. 595.)

CALJIC No. 8.88 is not unconstitutional for failing to require a finding that death is the "appropriate" punishment. (*People v. Lomax*, *supra*, 49 Cal.4th at p. 594; *People v. Hartsch*, *supra*, 49 Cal.4th at p. 516.)

The instructions did "not violate principles of equal protection of the law on the ground they provide safeguards different from those found in noncapital cases. [Citations.]" (*People v. Williams* (2008) 43 Cal.4th 584, 650; see also *People v. Loker* (2008) 44 Cal.4th 691, 756.)

## 8. *Denial of Motion to Modify Sentence*

Defendant claims the trial court erroneously denied the automatic motion to modify his death sentence. Section 190.4 requires the trial judge to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and . . . make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings." (§ 190.4, subd. (e).) " 'On appeal, we independently review the trial court's ruling after reviewing the record, but we do not determine the penalty de novo.' (*People v. Steele* (2002) 27 Cal.4th 1230, 1267.)" (*People v. Thompson* (2010) 49 Cal.4th 79, 141.)

Here, the trial court performed the required evidentiary review, independently weighing the evidence of aggravating and mitigating circumstances. It concluded that the circumstances of the offense were an aggravating factor of "simply enormous" weight. The court noted, "This case involved the murder of a four-year-old girl left in the defendant's care. The ongoing, and to my heart and my mind, numbing course of torture over a period of weeks which featured beating, tying, binding, burning, scalding, hanging, [was] all done within the sanctity of the home and apparently in concert with the defendant's wife and undoubtedly in the presence of his six children, who are now additional victims of his conduct. I have been involved in criminal law for over 26 years at this point, and this may be the most aggravated, continued torture of a single victim I have ever seen."

Regarding the extent of defendant's participation, the court was persuaded that "the defendant was a weaker personality than his wife." However, it did not believe his wife "dominated his decision-making to the point of lessening his

moral obligation or capacity to avoid the torturous and homicidal conduct that brings him to judgment today. In fact, I find it impossible to believe, based on the evidence presented to the jury, that this defendant was a passive participant in the crime." The court deemed it mitigating that defendant had a nonviolent background with a loving family, and was loved by his children. However, it concluded these factors were outweighed by the "lengthy, extensive, violent, sadistic course of conduct" that led to Genny's death.

Defendant does not take issue with these detailed findings. He merely asserts that the weight of the evidence does not support the death verdict. We disagree. The record strongly supports the verdict.

Defendant also asked the court to find the death penalty disproportionate, relying on *People v. Dillon* (1983) 34 Cal.3d 441. The court ruled that despite the support expressed for defendant from his large family, death was not a disproportionate penalty for "the extended, horrific, intentional torture murder of a four-year-old girl entrusted to his care." Defendant argues, briefly, that the denial of his *Dillon* motion was a separate error.

"To determine whether a sentence is cruel or unusual under the California Constitution as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including his or her age, prior criminality, and mental capabilities. (*People v. Dillon*[, *supra*,] 34 Cal.3d 441, 479.) If the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' (*ibid*.), so that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' (*People v. Cox*, *supra*, 53 Cal.3d at p. 690), the court

must invalidate the sentence as unconstitutional." (*People v. Lucero*, *supra*, 23 Cal.4th at pp. 739-740.)

Here, for the reasons given by the trial court, the death penalty cannot be said to be disproportionate. Defendant asserts without elaboration that the disproportionality of his punishment also violates the Eighth Amendment. We are not persuaded. The analysis is the same under the state and federal Constitutions. (*People v. Lucero*, *supra*, 23 Cal.4th at p. 739.)

### 9. *Cumulative Error*

Defendant contends the cumulative effect of the errors at his trial requires reversal. We conclude that any errors or assumed errors were not prejudicial, whether reviewed separately or cumulatively.

### 10. *International Norms*

Defendant asks us to reconsider our consistently expressed view that California's use of the death penalty does not violate international law or "norms," as defendant puts it. (See, e.g., *People v. Howard*, *supra*, 51 Cal.4th at p. 39; *People v. Lomax*, *supra*, 49 Cal.4th at p. 595.) We decline to do so.

## III. DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**KENNARD, J.**
**BAXTER, J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Gonzales

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S067353
**Date Filed:** August 2, 2012

_____

**Court:** Superior
**County:** San Diego
**Judge:** Michael D. Wellington

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Craig Buckser, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala G. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Holly D. Wilkens and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Craig Buckser
Deputy State Public Defender
801 K Street, Suite 1100
Sacramento, CA  95814-3518
(916) 322-2676

Annie Featherman Fraser
Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA  92101
(619) 645-2427